[No. 61804-1-I.    Division One.    November 23, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. SIONE P. LUI, *Appellant*.

*David B. Zuckerman*, for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Deborah A. Dwyer, Deputy*, for respondent.

¶1 LAU, J. — Sione Lui appeals his jury trial conviction for second degree murder in the strangulation death of his fiancée, Elaina Boussiacos. He argues that his Sixth Amendment right to confront the witnesses against him was violated when the State's medical examiner and DNA (deoxyribonucleic acid) expert testified based partially on forensic evidence developed by others. He relies principally on the Supreme Court's recent decision in *Melendez-Diaz v. Massachusetts*, ___ U.S. ___, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), which held that a drug analyst's "certificate of analysis" was testimonial and fell within the scope of the confrontation clause. We hold that no Sixth Amendment confrontation clause violation occurred here because Lui had a full opportunity to test the basis and reliability of the experts' opinions and conclusions. And because *Melendez-Diaz* does not preclude a qualified expert from offering an opinion in reliance upon another expert's work product, we affirm Lui's conviction.

## FACTS

¶2 On February 9, 2001, Elaina Boussiacos was found dead in the trunk of her car. The State charged Sione Lui with her murder.

¶3 Lui and Boussiacos began dating in 1999. By the end of 2000, they were living together in a Woodinville apart-

ment. They spoke of getting married, but both were jealous and their relationship was volatile. Shortly before her death, Boussiacos told a friend there was no trust in their relationship because of things Lui had done behind her back. Boussiacos had discovered that Lui was seeing another woman. In late January 2001, she told someone else it was over between her and Lui and they would have to decide which of them would move out.

¶4 On January 28, Boussiacos bought a plane ticket to visit her mother in California. The flight was scheduled to leave on Saturday, February 3, at 8:30 a.m. The night before her departure, she dropped her son off with his father around 9:30 or 9:45 p.m. But she failed to leave on her flight the next morning.

¶5 Lui reported Boussiacos missing on February 7. He told a police investigator that she had returned home around 10 p.m. on Friday, February 2, he slept on the couch after she went to bed, and when he awoke the next morning, she was already gone. He claimed that he and Boussiacos had not had sex in the prior two weeks. He suggested that she may have had car trouble and some man may have grabbed her. He also speculated that someone could have followed her if she had been sneaking out to smoke.

¶6 On February 9, detectives discovered Boussiacos's body in the trunk of her car, which was parked in a lot not far from Lui's apartment. Dr. Kathy Raven, a pathologist in the King County Medical Examiner's Office, performed an autopsy. Dr. Raven was unavailable to testify at Lui's trial because she had relocated to Nevada and was testifying in another case. The State called Dr. Richard Harruff to testify instead. Dr. Harruff, the chief medical examiner and pathologist for King County and Dr. Raven's supervisor, had cosigned the autopsy report. He explained, "To co-sign means that I have reviewed the report, the photographs, the materials collected, as evidence, I have discussed the case with the principal pathologist, and I signed to indicate

that I agree with the findings." Verbatim Report of Proceedings (VRP) (Apr. 16, 2008) at 1335-36.

¶7 He also testified that Dr. Raven performed Boussiacos's autopsy on February 10, 2001, and, at that time, he reviewed her work and agreed with her findings. He further testified that he discussed with Dr. Raven the wording to be used in the autopsy report to document the injuries observed during the autopsy. Dr. Harruff explained that in his supervisory role, he would not have signed the autopsy report unless it was completely accurate. And when describing his professional credentials, he said that as a forensic pathologist for many years, he had developed expertise on strangulation injuries. Finally, Dr. Harruff said he recalled viewing Boussiacos's body at some point because strangulation is a subtle type of injury that tends to generate more discussion within the medical examiner's office.

¶8 Lui objected that Dr. Harruff's testimony was based on hearsay, but the trial court overruled this objection, noting that experts can rely on hearsay under ER 703.[1] Lui also argued that the testimony would violate his right to confront the witnesses against him. The trial court ruled that Dr. Harruff could testify because "the confrontation requirement is satisfied by him being in court." VRP (Apr. 16, 2008) at 1347.

¶9 Dr. Harruff testified that Boussiacos was strangled to death.[2] He described signs of strangulation visible from the photographs taken during the autopsy and testified that it generally takes four minutes to strangle someone to death. In his opinion, Boussiacos could have died on February 2 or

---

[1] ER 703 provides, "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

[2] At trial, there was no material dispute that Boussiacos was strangled to death. And Lui asserted a general denial to the murder charge.

3 based on her body temperature when found.[3] But on cross-examination, he also testified that determining time of death is very difficult. He acknowledged the possibility that she could have died on February 4, 5, 6, or 7.[4] Dr.

---

[3] Dr. Harruff acknowledged that he was not at the scene and did not personally measure Boussiacos's body temperature. On the time of death, he testified on direct,

"Q. Doctor, can you tell us what the temperature of Ms. Boussiacos' body was at the time?

"A. If, well, the internal temperature taken at 10 minutes after midnight was recorded as 38.4 degrees Fahrenheit, compared with an am[b]ient temperature, that means the temperature inside, temperature inside of the environment, where the body was resting, was 30.5 degrees Fahrenheit.

"Q. When estimating the time of death, do the weather conditions have to be taken into account as well as the victim's temperature?

"A. Yes.

"Q. Why is that?

"A. The body is going to cool off according to the difference of temperature in the body and the temperature outside of the body.

"So it is just like any other cooling, loss of heat from one object to the environment. Weather conditions will determine what the temperature was outside and at some point the body and the environment would become equal.

"But, the environment may be changing from one time or place to another. So it would be important to know not just the temperature at the time that the body temperature was recorded, but also the temperature of the environment sometime before that temperature measurement was taken.

"I mean, obviously, during the daytime it is warmer [than] in the nighttime. It is cooler.

"The body will warm up, cool down, depending upon what is the environment.

"Q. So given those conditions, is it ever possible to set an exact time of death for any one?

"A. No. It is extremely difficult and not possible to fix the time exactly.

"Q. Given the weather at the time at the scene and her body temperature, is that consistent with the time of death, some time between the night of February 2nd in the morning of February 3rd?

"A. Again, the observations were made February 9th, late in the night and early morning on February 10th, just after midnight. So we have, according to the dates that you asked, that was a 7-day difference.

"Q. About?

"A. From the 2nd to the—

"Q. 6 to 7?

"A. 6 to 7 day difference. The environment was very cold. Certainly, variable during the day and the night. There is no reason to think that that period of time is not possible from the observations recorded." VRP (Apr. 16, 2008) at 1354-56.

[4] "Q. Regarding the time of death, you say that it is hard to determine.

Harruff also testified that Boussiacos's blood was submitted to the Washington State Toxicology Laboratory for drug and alcohol testing. When asked about the test results for nicotine, he stated, "Nicotine was not detected in the blood." VRP (Apr. 16, 2008) at 1398.

¶10 Over Lui's objections, the State also presented the expert testimony of Gina Pineda, an associate director of Orchid Cellmark, a private DNA testing company. Pineda previously worked for a similar company called Reliagene Technologies until Orchid Cellmark acquired it. Reliagene tested Boussiacos's shoelaces, and Orchid Cellmark tested Boussiacos's vaginal wash. Pineda did not personally conduct the tests, but she reviewed the notes and reports of the technicians who did.[5] Pineda explained that the testing results are reduced to a machine printout that any expert can review and draw conclusions from. Pineda also testified about the laboratory's chain of custody procedures, the protocols and tests involved, laboratory technician training and certification, and other quality assurance measures.[6]

---

"A. Yes, very difficult, yes.

"Q. All right. We know that the victim was last seen alive on Friday the 2nd of February. Now, are you saying that the condition that the body was found is consistent with her having died on the 3rd?

"A. That is in the range of possibilities, depending upon the environment, which the body was between the time of death and when the examination was performed.

"Q. Is death on the 4th within the range of possibilities?

"A. Yes.

"Q. Death on the 5th?

"A. Yes.

"Q. Death on the 6th?

"A. Probably so.

"Q. On the 7th?

"A. It is possible, but then at that point the likelihood decreases, but still possible." VRP (Apr. 16, 2008) at 1398-99.

[5] In this case, at least six different people were involved in generating and assessing the DNA results.

[6] Pineda testified as follows:

"Q. I want to refer or direct your attention to the actual testing that was done in this case.

"With regard to the items that went to Reliagene, what was your role in that testing?

"A. I was a case reviewer in that case.

"Q. What does that mean?

"A. That means that every case that goes through our laboratory has to undergo a technical review, as well as an administrative review.

"A technical review makes sure that all of the standard protocols were followed. All of the controls produced expected results. It also checks to make sure that the interpretation of the profile is adequate, as far as inclusion or exclusion of any individuals in the case.

"It also entails signing the report. So that was my role in this case, as I did a technical and administrative review of the work that was done at Reliagene.

"I concurred with the interpretation of the results from the case analysts, I, therefore, signed a report.

"Q. With regard to the information that you looked at, obviously, I think that we have heard you didn't do any of the direct testing yourself; correct?

"A. Correct.

"Q. Did you look at all of the testing and the procedures that were documented by the analysts?

"A. Yes, I did.

"So every time that [an] analyst does anything in the laboratory, that's documented. We have work sheets in conjunction with these standard operating procedures. So we require our analysts, for example, every time that they put a sample into the oven, they have to record the time and the date that that sample was placed in the oven, as well as when it was taken out.

"Everything is thoroughly documented. Each step of the procedure has a permanent record that is maintained in the form of a case file.

"Every step was reviewed by me in this case. Everything that was, I could see that everything was done adequately from this documentation.

"Q. All right.

"With regard to the results that were obtained, did you simply rely on the conclusion made by the analysts in the case, or did you do your own quantification come to your own results?

"A. I came to my own results.

". . . .

"I did look at the electronic data from the results in the samples in this case. I did draw my own interpretation and my own conclusions from it.

". . . .

"Q. Based upon your knowledge of the workings of Orchid, was . . . it handled and preserved in the same ways that you previously testified regarding the other samples in this case?

"A. Yes, it was. Not only based on the standard of the operating procedures, I have also reviewed all of the laboratory documentation and the supporting documents that indicate that the testing was performed appropriately." VRP (Apr. 21, 2008) at 1505-36.

¶11 Based on her independent review of the testing results, Pineda concluded that Lui—unlike 99.7 percent of the population—could not be excluded as a major donor to the DNA on the shoelaces. She also testified that the vaginal wash testing revealed a single male donor and that Lui—unlike 99.8 percent of the population—could not be excluded as the donor.[7]

¶12 In closing argument, the prosecutor summarized the State's evidence against Lui. She pointed to witnesses who described Lui as jealous and possessive. She argued from other witness statements that Boussiacos decided to end the relationship shortly before being killed. She emphasized that Lui was alone with Boussiacos on the night of February 2, 2001, the last time anyone reported seeing her alive. Under the State's theory of the case, Lui strangled Boussiacos to death that night or the following morning, which was consistent with Dr. Harruff's opinion regarding the time of death.

¶13 The prosecutor also argued that Lui's version of events was not credible. She cited several examples of his giving different accounts to different witnesses. He told some people that he and Boussiacos had ended their relationship but others that they were still planning to marry. He gave varying accounts of his relationship with another woman. He told some people that Boussiacos's trip to California was long planned but others that he did not know about it until the night before. The prosecutor also noted that Lui claimed not to have had sex with Boussiacos but that Pineda's testimony regarding the vaginal wash DNA test results suggested the contrary. And she mentioned that no nicotine was found in Boussiacos's system

---

[7] On cross-examination, Lui's counsel questioned Pineda about why the words "predominate contributor" were used in the laboratory's written report summarizing the vaginal wash results. She responded that the word "predominate" was used "in order to be conservative" because "there was some additional peaks detected below threshold," but that based on her independent review of the data and her discussions with the laboratory analysts, her opinion was that there was a single contributor. VRP (Apr. 21, 2008) at 1568-70.

despite Lui's suggestion that she might have been abducted while sneaking outside to smoke.

¶14 The prosecutor further argued that Lui dressed Boussiacos and attempted to make it appear that she left the house on her own. Pineda's testimony about the DNA testing of Boussiacos's shoelaces supported this argument. Additionally, the prosecutor argued that Boussiacos was not wearing makeup as she customarily did and the materials found in her car were not what she would have packed for her visit to California. And in rebuttal closing argument, the prosecutor again emphasized Lui's motive and opportunity to kill Boussiacos.

¶15 The jury convicted Lui of second degree murder as charged. The court sentenced him within the standard range. He now appeals.

## ANALYSIS

¶16 Relying principally on *Melendez-Diaz*, Lui contends that the admission of Dr. Harruff's and Pineda's testimony violated his right to confront the witnesses against him. He argues that they relied on forensic evidence developed by others whom he had no opportunity to cross-examine. In Lui's view, these individuals—Dr. Raven and various DNA laboratory technicians—were witnesses against him and he had the right to face them in the courtroom. We review an alleged violation of a defendant's confrontation rights de novo. *State v. Kirkpatrick*, 160 Wn.2d 873, 881, 161 P.3d 990 (2007).

¶17 The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Court reviewed the history and purpose of this clause. The Court noted that the right to confront one's accusers was deeply rooted in English common law by the time of the American Revolution, but that it was occasionally dispensed with in favor of the

civil-law practice of permitting judicial officers to privately examine witnesses with no opportunity for cross-examination. *Crawford*, 541 U.S. at 43. During the reign of Queen Mary, the adoption of this continental procedure became more common, which led to English efforts to curb the practice and its perceived abuses. *Crawford*, 541 U.S. at 43-44. The Court described similar controversies at the time of the American Revolution and ratification of the Constitution and concluded that the confrontation clause was adopted in response. *Crawford*, 541 U.S. at 47-49. Thus, the "principal evil" at which the clause was directed was the civil-law system's use of ex parte examinations and ex parte affidavits as substitutes for live witnesses in criminal cases. *Crawford*, 541 U.S. at 50. This practice denies the defendant a chance to test his accuser's assertions "in the crucible of cross-examination" in accord with the common-law tradition. *Crawford*, 541 U.S. at 61.

¶18 But the Court also emphasized that not every out-of-court statement used against a defendant at trial implicates the core concerns of the confrontation clause. For example, "[a]n off-hand, overheard remark . . . bears little resemblance to the civil-law abuses the Confrontation Clause targeted." *Crawford*, 541 U.S. at 51. The Court noted that the scope of the clause is limited to " 'witnesses' against the accused—in other words, those who 'bear testimony.' 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Crawford*, 541 U.S. at 51 (alteration in original) (citation omitted) (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Thus, the Court concluded the confrontation clause gives defendants the right to confront those who make "testimonial" statements against them and it bars admission of adverse "testimonial" hearsay.[8] *Crawford*, 541 U.S. at 53-54.

---

[8] A limitation on the right to confrontation that existed at common law—inapplicable here—applies when a witness is unavailable and the accused had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 54. The Court also stated that the confrontation clause does not bar testimonial state-

¶19 The *Crawford* Court declined to offer a comprehensive explanation of what makes a statement "testimonial," but it listed three possible formulations for the "core class" of testimonial statements covered by the confrontation clause:

[(1)] *"ex parte* in-court testimony or its functional equivalent— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; [(2)] "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; [(3)] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Crawford*, 541 U.S. at 51-52 (third alteration in original) (citations omitted) (quoting *White v. Illinois*, 502 U.S. 346, 365, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992) (Thomas, J., dissenting in part)). The Court did not endorse any of these formulations because the statements at issue—made in response to law enforcement interrogation—qualified under all of them. *Crawford*, 541 U.S. at 52.

¶20 And in *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Court refined the meaning of "testimonial" statements in the context of law enforcement interrogations. At issue were statements made during a 911 call and, in a companion case, statements made at a crime scene during police interrogation of the alleged victim. *Davis*, 547 U.S. at 817. The Court concluded that the statements made to the 911 operator were nontestimonial because their primary purpose was to enable police assistance to meet an ongoing emergency. The Court reasoned that the declarant "was not acting as a *witness*; she was not *testifying*. . . . No 'witness' goes into court to proclaim an emergency and seek help." *Davis*, 547 U.S. at 828. In contrast, the statements made at the crime

ments offered for some purpose other than proving the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9.

scene were testimonial because they were elicited during police interrogation to prove past events potentially relevant to criminal prosecution. *Davis*, 547 U.S. at 822. The alleged victim signed a statement summarizing her version of events, and the document was offered at trial when the victim did not appear. *Davis*, 547 U.S. at 820. The Court concluded that admission of such statements "are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial."[9] *Davis*, 547 U.S. at 830.

¶21 Recently, the Court again addressed the reach of the confrontation clause in *Melendez-Diaz*, 129 S. Ct. 2527. There, the defendant was charged with distributing and trafficking in cocaine. To prove that the substance officers seized from him was in fact cocaine, the prosecutor submitted three "certificates of analysis" sworn to by laboratory analysts before a notary public.[10] The certificates stated simply, " 'The substance was found to contain: Cocaine.' " *Melendez-Diaz*, 129 S. Ct. at 2531. A five-member majority of the Court concluded under a "rather straightforward" application of *Crawford* that the certificates were inadmissible. *Melendez-Diaz*, 129 S. Ct. at 2533. After determining the certificates were "quite plainly affidavits," the Court

---

[9] Justice Thomas disagreed with the reasoning in the majority opinion in *Davis*, particularly its focus on the " 'primary purpose' " behind police interrogation. *Davis*, 547 U.S. at 834 (Thomas, J., dissenting in part). Instead, he argued that the clause was designed to reach only " 'formalized testimonial materials' " and none of the statements made to police in *Davis* were sufficiently formal to make the declarants "witnesses" within the meaning of the confrontation clause. *Davis*, 547 U.S. at 836-37 (Thomas, J., dissenting in part) (quoting *White*, 502 U.S. at 365 (Thomas, J., dissenting in part)).

The majority acknowledged that most of the early American cases excluding evidence for lack of confrontation involved very formal testimonial statements such as sworn testimony or depositions under oath. *Davis*, 547 U.S. at 825-26. Nevertheless, it rejected Justice Thomas's interpretation out of concern that it could lead prosecutors to avoid calling a defendant's accusers as live witnesses by sending police officers to conduct "informal" interrogations of those witnesses and then presenting the accusations through the officers' testimony. "[W]e do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." *Davis*, 547 U.S. at 826.

[10] The prosecutor presented no expert witness testimony on this point.

held that they constituted "testimonial" statements because they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Melendez-Diaz*, 129 S. Ct. at 2532 (quoting *Davis*, 547 U.S. at 830). Moreover, the statements were "'made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial.'"[11] *Melendez-Diaz*, 129 S. Ct. at 2532 (internal quotation marks omitted) (quoting *Crawford*, 541 U.S. at 52). Consequently, the analysts were "witnesses" for confrontation clause purposes and Melendez-Diaz had the right to confront them. *Melendez-Diaz*, 129 S. Ct. at 2532. Because he was not given this opportunity, the evidence should not have been admitted. *Melendez-Diaz*, 129 S. Ct. at 2542. The Court concluded, "The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error." *Melendez-Diaz*, 129 S. Ct. at 2542.

¶22 The majority also discussed and rejected several counterarguments. First, it rejected the suggestion that laboratory analysts are not subject to the confrontation requirement because they are not "accusatory" or "conventional" witnesses. *Melendez-Diaz*, 129 S. Ct. at 2533-35. Second, it rejected the argument that forensic analysts should not have to testify live because their testimony would be the result of "'neutral, scientific testing'" that is not "'prone to distortion or manipulation,'" and confrontation would be unlikely to affect their testimony. *Melendez-Diaz*, 129 S. Ct. at 2536. Third, it rejected the argument that forensic reports qualify for a business or public records

---

[11] While Justice Thomas signed the majority opinion, he noted in a concurrence that he continues to adhere to his view that the confrontation clause is implicated only by extrajudicial statements that are contained in "formalized" testimonial materials. *Melendez-Diaz*, 129 S. Ct. at 2543 (Thomas, J., concurring). He stated that he joined the majority opinion because the documents at issue satisfied this test.

exception to the confrontation requirement.[12] Finally, it rejected the suggestion that the confrontation clause was satisfied because the defendant could have subpoenaed the analysts. *Melendez-Diaz*, 129 S. Ct. at 2540.

¶23 Four members of the Court dissented. They noted that producing a forensic test result often requires multiple people and one possible reading of the majority's opinion would require each of them to testify live. *Melendez-Diaz*, 129 S. Ct. at 2544-45 (Kennedy, J., dissenting). While the majority did not respond directly to this point, it characterized the dissent's concerns generally as an exaggerated "parade of horribles," and it explicitly rejected the suggestion that the State would need to call every person involved in the chain of custody. *Melendez-Diaz*, 129 S. Ct. at 2542.

> [W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. . . . "[G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live.

*Melendez-Diaz*, 129 S. Ct. at 2532 n.1 (last alteration in original) (quoting *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988)).

¶24 We conclude that *Melendez-Diaz* is distinguishable from Lui's case. In *Melendez-Diaz*, the disputed evidence consisted of sworn affidavits of laboratory analysts who were not made available for cross-examination.[13] The Court emphasized that the certificates were used in lieu of

---

[12] Consequently, the State's reliance on a business records argument here is unpersuasive.

[13] Many state statutes permit the use of certificates of analysis but typically restrict them to the identification of controlled substances or driving under the influence cases involving breath alcohol test results and calibration records. Several state statutes permit nearly all laboratory results or forensic science findings to be admitted through certificates. Jennifer L. Mnookin, *Expert Evidence*

live, in-court testimony. *Melendez-Diaz*, 129 S. Ct. at 2532. Here, in contrast, the autopsy and DNA reports were not offered in lieu of live testimony. Indeed, the reports themselves were not admitted into evidence at all. Rather, Dr. Harruff testified to his own opinions and conclusions about the cause and timing of Boussiacos's death. And Pineda testified to her own analysis of the DNA testing data. The evidence against Lui was the experts' opinions—not their underlying data—and the testimony that was introduced was introduced live. Moreover, in *Melendez-Diaz*, the disputed evidence was a "bare-bones statement" that the substance tested contained cocaine, and the defendant "did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." *Melendez-Diaz*, 129 S. Ct. at 2537. But here, both experts testified extensively about their own expertise and that of their employees, the protocols and procedures used in their respective offices, and the tests employed in Lui's case. Lui had the opportunity to challenge their assertions in the " 'crucible of cross-examination.' " *Melendez-Diaz*, 129 S. Ct. at 2536 (quoting *Crawford*, 541 U.S. at 61-62). This situation is fundamentally different from *Melendez-Diaz*, where the State improperly used ex parte out-of-court affidavits to prove its case. Here, the very live testimony absent in *Melendez-Diaz* was present.

¶25 Lui argues that the presence of Dr. Harruff and Pineda as live witnesses still violated his right to confrontation because they relied on testimonial reports made by others and related information from those reports to the jury.[14] In Lui's view, Dr. Harruff and Pineda were simply

---

*and the Confrontation Clause after* Crawford v. Washington, 15 J.L. & POL'Y 791, 798 (2007).

[14] Lui argues that the autopsy and DNA reports were testimonial because they satisfied the third formulation proposed in *Crawford*—" 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Crawford*, 541 U.S. at 52. Based on Justice Thomas's concurrence in *Melendez-Diaz*, it is not

acting as surrogates for the true witnesses against him, and his ability to cross-examine them was not a constitutionally adequate substitute for confrontation of their sources. We disagree.

¶26  Lui argues that it is possible for forensic analysts to fraudulently affect laboratory results undetected by their supervisors. He notes that such fraud could be revealed during cross-examination. But the same is true for people involved in the chain of custody, yet the Supreme Court expressly rejected the notion that such individuals must appear as part of the State's case. *Melendez-Diaz*, 129 S. Ct. at 2532 n.1.

¶27  Lui also relies on the following language from *Davis*:

"[W]e do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition."

Appellant's Reply Br. at 5 (quoting *Davis*, 547 U.S. at 826). But our review of the record shows that the expert witnesses here were not acting as mere conduits for the testimonial assertions of their employees.[15] Dr. Harruff testified based on his own expertise in strangulation and his independent review of the autopsy photographs and other data recorded in the autopsy report. Similarly, Pineda

clear that a majority of the Court supports this broad definition. But for purposes of our analysis, we assume that the underlying reports are "testimonial."

[15] But even if Dr. Harruff's testimony regarding Boussiacos's nicotine test results and body temperature measurement is viewed as merely repeating the assertions of others, we conclude the error, if any, is harmless. Lui speculated that someone could have followed Boussiacos if she had been sneaking out to smoke. And in closing argument, the prosecutor made a passing reference to the lack of nicotine in her blood. But in the context of the State's entire case, this evidence was marginally relevant. Lui never claimed Boussiacos left the house to smoke. His suggestion was merely conjecture. And there was no testimony about how long nicotine would have been detectable in her blood in any event. The strength of the State's case—and its closing argument—centered on motive and opportunity, not the toxicology test result. Similarly, the record demonstrates that Dr. Harruff's time of death testimony based in part on Boussiacos's body temperature measurement supported both the State and Lui's theory about when she died. *See supra* notes 2 and 3. There is no reasonable probability this evidence contributed prejudicially to the verdict.

testified based on her own interpretation of the machine-generated raw data. Both experts applied significant expertise to interpret and analyze the underlying data. And neither witness simply read to the jury from Dr. Raven's and the DNA laboratory technicians' reports.[16] Indeed, Pineda deviated from her laboratory's written report when it conflicted with her own opinion. This is not a case where the State produced expert witnesses simply to have them recite out-of-court statements made by others as a way to evade the protections of the confrontation clause. Consequently, Lui's reliance on this passage from *Davis* is misplaced.[17]

¶28 While Lui is correct that the expert opinion testimony against him was partially based on the reports of others, expert witnesses are not required to have personal, firsthand knowledge of the evidence on which they rely. *In re Disability Proceeding Against Keefe*, 159 Wn.2d 822, 831, 154 P.3d 213 (2007). In Washington, ER 703 expressly allows experts to base their opinion testimony on facts or data that are not admissible in evidence "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject . . . ." The Federal Rules of Evidence are in accord. *See* FED. R. EVID. 703. And ER 705 gives the trial court discretion to permit an expert to relate hearsay or otherwise inadmissible evidence to the jury for the limited purpose of explaining the reasons for his or her opinion.[18] *Deep Water Brewing, LLC v. Fairway Res., Ltd.*, 152 Wn. App. 229, 215 P.3d 990

---

[16] Lui relies on *State v. Hopkins*, 134 Wn. App. 780, 791, 142 P.3d 1104 (2006), in which the court determined that a doctor's testimony relating the contents of a nurse's report was a confrontation clause violation. But in that case, there is no suggestion that the doctor did anything other than read the nurse's statements to the jury. It appears from the opinion that the nurse was unable to testify because of a sudden emergency. *Hopkins*, 134 Wn. App. at 784.

[17] We also note that this statement was part of the majority's response to Justice Thomas's opinion that the confrontation clause is implicated only by "formalized" testimonial materials, such as sworn statements to police officers. It was not essential to the Court's holding, and its applicability to situations not involving police evasion is unclear.

[18] A party is entitled to an appropriate limiting instruction in this situation, but Lui did not request any limiting instruction. And on appeal, he does not challenge the admissibility of the disputed evidence based on ER 703 or 705.

(2009); *State v. Brown*, 145 Wn. App. 62, 74, 184 P.3d 1284 (2008).

¶29 While Lui's confrontation challenge presents a separate question than a challenge based on the rules of evidence, *see Crawford*, 541 U.S. at 51 (noting that evidence excluded under hearsay rules may be permitted under the confrontation clause, or vice versa), in this case the answer is the same. To the extent the experts here related testimonial hearsay statements to the jury, they did so to explain the bases for their opinions. This is permitted under both the rules of evidence and the confrontation clause.[19] *See Allen v. Asbestos Corp.*, 138 Wn. App. 564, 579, 157 P.3d 406 (2007) ("ER 703 permits experts to base their opinion testimony on facts or data that is not admissible in evidence . . . . The otherwise inadmissible facts or data underlying an expert's opinion are admissible for the limited purpose of explaining the basis for an expert's opinion . . . ."); *Crawford*, 541 U.S. at 59 n.9 ("The Clause also

---

Under ER 705, "[t]he expert may testify in terms of opinion or inference and give reasons therefore without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination." Commenting on the rule, Karl B. Tegland explains,

"If the expert's opinion is based upon hearsay, Rule 705 permits the court to allow the expert to relate the hearsay to the jury to explain the reasons for his or her opinion.

"Since the hearsay material is admissible only for the limited purpose of explaining the expert's opinion, it follows that such material is admissible for the limited purpose only if the expert actually relied upon the material in reaching an opinion. The courts will not allow Rule 705 to be used as a vehicle for having an expert witness read from materials, otherwise objectionable as hearsay, when the expert did not rely upon the materials in reaching his or her opinion." 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE ER 705 author's cmt. 6, at 385 (2009-10 ed.). In addition, ER 705 is substantially the same as the corresponding federal rule.

[19] Lui cites a New York case, *People v. Goldstein*, 6 N.Y.3d 119, 843 N.E.2d 727, 810 N.Y.S.2d 100 (2005), to argue that such out-of-court statements should not be admitted because they cannot assist the jury in evaluating an expert's opinion unless the jury first assumes they are true. We are not persuaded by this argument. The very fact that an expert *has* an articulable basis for an opinion can assist the jury in deciding what weight to give the opinion. Moreover, *Goldstein* is factually dissimilar because it presented a different hearsay question, which involved statements made to a psychiatrist who was evaluating the defendant's sanity. We decline to adopt its reasoning in this context.

does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). The experts' testimony here is subject, as a matter of right, to an instruction limiting the purposes for which it was offered, but its admission did not violate Lui's right to confrontation.[20]

¶30 And our conclusion is supported by similar cases decided since *Melendez-Diaz* that have adopted the same rationale. For example, in *People v. Rutterschmidt*, 176 Cal. App. 4th 1047, 98 Cal. Rptr. 3d 390, 409 (2009), the defendant argued that the expert testimony of a laboratory director regarding his laboratory's toxicology results violated the confrontation clause because the director did not personally test the samples. The appeals court rejected this argument, stating, "There is no federal Supreme Court or California authority for the proposition that *Crawford* precludes a prosecution scientific expert from testifying as to an opinion in reliance upon another scientist's report." *Rutterschmidt*, 98 Cal. Rptr. 3d at 411. It distinguished *Melendez-Diaz* on the critical grounds that the report itself was not admitted in evidence, the toxicology results were not proved via an ex parte out-of-court affidavit, the expert relied upon the data in the report to formulate his opinions, and the expert's opinion and its basis were subject to cross-examination. *Rutterschmidt*, 98 Cal. Rptr. 3d at 412. It further noted that experts are permitted to offer opinions based on inadmissible hearsay and to explain the reasons for their opinions. *Rutterschmidt*, 98 Cal. Rptr. 3d at 412-13. Finally, it reasoned that such testimony does not violate the confrontation clause because it is offered to explain the expert's opinion, not for its truth. *Rutterschmidt*, 98 Cal. Rptr. 3d at 413.

---

[20] ER 105 provides, "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." And if evidence is admissible only for a limited purpose, an appropriate limiting instruction is available as a matter of right. *State v. Redmond*, 150 Wn.2d 489, 78 P.3d 1001 (2003) (trial court erred in failing to give instruction limiting the use of an out-of-court statement to a nonhearsay purpose). The record here shows no limiting instruction was requested or given.

¶31 And in *People v. Johnson*, 394 Ill. App. 3d 1027, 915 N.E.2d 845, 333 Ill. Dec. 774 (2009), the defendant challenged an expert's testimony regarding DNA test results, arguing that he had no opportunity to cross-examine the analysts who conducted the testing. The court distinguished *Melendez-Diaz*, noting that "[i]n contrast with certificates presented at trial" there, the DNA expert in the case before it "testified in person as to [her] opinion[ ] based on the DNA testing and [was] subject to cross-examination." *Johnson*, 915 N.E.2d at 854. The court noted that experts are permitted to disclose underlying facts and data to the jury in order to explain the basis for their opinions. *Johnson*, 915 N.E.2d at 850 (quoting *People* v. *Williams*, 385 Ill. App. 3d 359, 369, 895 N.E.2d 961, 324 Ill. Dec. 246 (2008)). It concluded that the DNA report at issue was offered as part of the basis for the expert opinion, so there was no confrontation violation. *Johnson*, 915 N.E.2d at 850.

¶32 Finally, in *People v. Lovejoy*, 235 Ill. 2d 97, 919 N.E.2d 843, 866, 335 Ill. Dec. 818 (2009), the defendant argued that the admission of a medical examiner's testimony about toxicology test results violated his right to confrontation because the tests were performed by others. The Illinois Supreme Court rejected this contention. *Lovejoy*, 919 N.E.2d at 869. The medical examiner testified that he was trained in toxicology interpretation and that the toxicology report showed lethal amounts of several medications in the victim's blood. *Lovejoy*, 919 N.E.2d at 867. He explained how this information provided insight into his own physical observations during the autopsy and that the combination helped him determine the cause of the victim's death. *Lovejoy*, 919 N.E.2d at 869. The court concluded that the medical examiner's testimony "was elicited to show the jury the steps [he] took prior to rendering an expert opinion in this case, and was not admitted to prove the truth of the underlying assertion." *Lovejoy*, 919 N.E.2d at 869. Consequently, *Melendez-Diaz* was not implicated and there was no confrontation clause violation. *Lovejoy*, 919 N.E.2d at 870.

¶33 We agree with these well-reasoned cases.[21] Here, Dr. Harruff and Pineda testified as expert witnesses against Lui. Though their opinions were based partially on forensic work performed by others, the record shows that their opinions and conclusions were independently derived from their significant expertise and analysis that they applied to the forensic work of others. They did not base their opinions solely on testimonial hearsay and merely recount what others who performed forensic work said. And to the extent they disclosed information provided by others to the jury, that information was offered to explain the basis for their opinions as provided for under the Rules of Evidence.

¶34 Finally, our review of the record shows that Lui had full opportunity to test the basis and reliability of the experts' opinions and conclusions "in the crucible of cross-examination." *Crawford*, 541 U.S. at 61. Under these circumstances, we hold that Lui's confrontation rights were not violated.

¶35 Affirmed.

BECKER and LEACH, JJ., concur.

Review granted at 168 Wn.2d 1018 (2010).

---

[21] We acknowledge that some courts have reached contrary results. *See, e.g.*, *People v. Dungo*, 176 Cal. App. 4th 1388, 98 Cal. Rptr. 3d 702 (2009) (holding that supervising pathologist could not testify based on autopsy performed by another). But we conclude the line of cases discussed above is more persuasive.