FILED
COURT OF APPEALS
DIVISION II

2013 FEB 26 AM 10: 21

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41999-8-II |
| Respondent, | |
| v. | |
| CARMEN LUCERO DIAZ, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, C.J. — A jury found Carmen Diaz guilty of second degree rape by forcible compulsion. He appeals his conviction, arguing (1) the trial court erred by denying his motion to dismiss based on the deportation of a material witness, (2) a sexual assault nurse gave improper opinion testimony at trial, and (3) his confrontation rights were violated when the sexual assault nurse testified based on the report of another sexual assault nurse who had examined the victim. We affirm.

## FACTS

Diaz was convicted of second degree rape of LS. Prior to trial, defense counsel learned that LS's brother-in-law, Julian Asencio Zamora,[1] had information material to the case. Defense counsel subsequently learned that Zamora was being held in the Immigration and Customs Enforcement (ICE) detention facility in Tacoma. Although defense counsel obtained a material witness warrant and a transport order to bring Zamora to Clark County, ICE deported Zamora.

---

[1] The record offers several different versions and spellings of Zamora's name, including Julio Arsencio Zamora, Julian Asenciao Zamora, Julian Asencio, and Julian Arcencio Zimora.

Diaz filed a CrR 8.3(b) motion to dismiss the case against him for government misconduct, submitting documentary evidence regarding Zamora's expected testimony, and Zamora's transport and deportation. After hearing oral argument, the trial court denied Diaz's motion. Diaz moved for reconsideration, submitting additional evidence in the form of a defense investigator's memorandum reporting a Clark County transport sergeant's explanation of why Clark County did not transport Zamora. The trial court heard argument on Diaz's motion for reconsideration mid-trial, and orally denied the motion.

According to LS's testimony at trial, Diaz came to her apartment after the two had ended a live-in relationship. After LS let him in, Diaz pulled LS's clothes off and raped her.

Diaz testified to a different version of events at trial. According to Diaz, he went to LS's house because he heard that her children missed him and that she did not have money to pay rent. LS was happy to see him, and they had consensual sex.

According to proffers by Diaz, Zamora would have supported Diaz's version of events, testifying that LS told Zamora she invited Diaz to her apartment for dinner, and she made no mention of Diaz sexually assaulting her. Zamora also would have testified that LS told him she would be able to "get papers" (presumably, immigration papers) if she was a victim of domestic violence. Clerk's Papers (CP) at 422.

Also at trial, the State called sexual assault nurse Irene Sheppard. Sheppard did not examine LS after the rape but, rather, reviewed the documentation of the nurse who did. The examining nurse did not testify because she had cancer. Sheppard's testimony included the opinion that one of LS's injuries was typical of sexual assault and childbirth, to which Diaz did not object. Sheppard also testified that LS had injuries consistent with being forcibly held down,

2

being bitten, being thrown onto her back, and being forcibly held on her back. Diaz again did not object to this testimony.[2]

## ANALYSIS

### I. MOTION TO DISMISS

In supplemental briefing, Diaz argues that the trial court erred by denying his CrR 8.3(b) motion to dismiss the case against him based on Zamora's deportation. Diaz failed to meet his burden of production on this issue, and thus the trial court did not err in denying Diaz's motion to dismiss.

A.    *Standard of Review*

Under CrR 8.3(b), a trial court "in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Diaz bears the burden of proving both misconduct and prejudice by a preponderance of the evidence. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

Government misconduct "'need not be of an evil or dishonest nature; *simple mismanagement is sufficient.*'" *State v. Michielli*, 132 Wn.2d 229, 239, 937 P.2d 587 (1997) (quoting *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993)). But dismissal of charges under CrR 8.3(b) is an extraordinary remedy. *State v. Stein*, 140 Wn. App. 43, 53, 165 P.3d 16 (2007). Dismissal is appropriate only "in 'truly egregious cases of mismanagement or misconduct.'" *State v. Wilson*, 149 Wn.2d 1, 9, 65 P.3d 657 (2003) (quoting *State v. Duggins*, 68 Wn. App. 396, 401, 844 P.2d 441 (1993)).

---

[2] The prosecutor had previously elicited this testimony during voir dire of Sheppard, outside the presence of the jury. Diaz offered no objection outside the jury's presence, either.

We review a trial court's decision on a CrR 8.3(b) motion to dismiss for a manifest abuse of discretion. *Rohrich*, 149 Wn.2d at 654. A trial court abuses its discretion when it relies on unsupported facts, applies the wrong legal standard, or when it adopts a view that no reasonable person would take. *Rohrich*, 149 Wn.2d at 654.

B.     *Diaz Failed To Meet His Burden of Production*

Diaz argues that the State's failure to secure Zamora pursuant to the material witness warrant was misconduct that denied him his constitutional right to compulsory process and thus prejudiced his right to a fair trial. But Diaz did not meet his burden of production on this issue and his claim accordingly fails.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee an accused the right to compulsory process to compel the attendance of witnesses. *State v. Maupin*, 128 Wn.2d 918, 924, 913 P.2d 808 (1996). The right to compulsory process is violated when the "'sovereign's conduct'" impermissibly interferes with the defendant's right to mount a defense. *State v. McCabe*, 161 Wn. App. 781, 787, 251 P.3d 264 (2011) (quoting *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990)). In other words, "[t]he contested act or omission must be attributable to the sovereign." *McCabe*, 161 Wn. App. at 787.

Here, Diaz has failed to show that the government committed any misconduct, let alone any misconduct that was prejudicial to Diaz's case. Although the parties do not dispute that Diaz had the Sixth Amendment right to compel Zamora's testimony, the record does not show that any government misconduct caused Zamora's failure to appear.

1. *Diaz's Evidence of Government Misconduct*

The State was not aware of Zamora's identity until July 9, 2010, when defense counsel e-mailed the prosecutor to inform her that Zamora was being held in ICE custody and defense counsel would move ex parte for a material witness warrant. Aside from this e-mail, the prosecutor's only involvement in the case was to e-mail defense counsel on July 19, stating that "Tracy at US Customs" indicated that "they deported Julian Asencio Zamora." CP at 457. Diaz provided no evidence of the date or circumstances of this deportation.

Diaz showed that the trial court granted his ex parte motion for a material witness warrant on July 9. He further showed that the trial court granted his July 12 ex parte motion for an order to transport Zamora to Clark County. Diaz showed that defense counsel's paralegal contacted "Tracy Café" at ICE on July 12 and that Tracy acknowledged receipt of the transport order and "was waiting to hear from Patty at Pierce County." CP at 453. On July 13, "Patty" told the paralegal that "she needed to contact Clark County to figure out how they wanted to do the transport since it's a witness." CP at 453.

On July 14, the judicial assistant to the judge who signed the transport order e-mailed defense counsel that, according to the transport sergeant of the Clark County Jail, "they can not transport the material witness . . . . They are not permitted to transport material witness' [sic] for private attorneys, and it is a safety issue for the witness and they are not permitted to transport him on their shuttle." CP at 451. Then, on July 19, the same judicial assistant e-mailed defense counsel that "Pierce County can not and will not be transporting Mr. Asencio on the chain." CP at 455.

Based on this evidence, Diaz moved to dismiss the case under CrR 8.3(b). After hearing argument, the trial judge orally denied the motion, ruling that there was insufficient evidence to connect any State action with Zamora's deportation.

Defense counsel subsequently filed a motion for reconsideration of the trial court's ruling, attaching an investigator's report with additional information about the State's refusal to transport Zamora. The investigator reported that he spoke to the Clark County Jail's transport sergeant, who told him that the Clark County Jail required all transport requests to go through the prosecutor's office. Because the transport would be handled by the institution where the witness was housed, the Clark County Jail needed paperwork from the prosecutor that would allow them to coordinate with the other institution. Moreover, the Clark County Jail did not have any established procedures for coordinating with the ICE detention facility. The transport sergeant further informed the investigator that because Zamora was not an inmate in Clark County Jail, "it would have been a security and liability issue trying to transport this individual from Tacoma to Vancouver." CP at 600.

Defense counsel also attached a subpoena duces tecum served on ICE for all records relating to Zamora. Notably, the subpoena identified Zamora as "Julian Arsencio Zamora (DOB 12/10/1984)," while the material witness warrant and transport order identified him as "Julian Asencio Zamora, Presumed Date of Birth: December 14, 1980." CP at 430, 440 (emphasis omitted). According to the motion for reconsideration, ICE ignored the subpoena and provided no records. The trial court orally denied the motion for reconsideration, ruling there was still insufficient evidence that the State caused Zamora's absence.

### 2. *Diaz Did Not Show Misconduct*

The trial court did not abuse its discretion in denying Diaz's CrR 8.3(b) motion to dismiss or his motion for reconsideration. Diaz did not meet his burden of production to show that any government misconduct occurred, let alone that any government misconduct prejudiced him by leading to Zamora's deportation.

Diaz called no witnesses to support his motion to dismiss. He did not identify the Pierce County transport officer who refused to transport Zamora. He did not establish who "Tracy Café" was, only that he or she was apparently an ICE employee. He did not show the date of Zamora's deportation, including whether it was before or after issuance of the material witness warrant. Diaz did not even show that the man deported by ICE was the same individual identified as a material witness to the case. Diaz accordingly did not meet his burden to show government misconduct that prejudiced him and the trial court did not abuse its discretion by denying his CrR 8.3(b) motion. His claim to the contrary fails.

## II. OPINION TESTIMONY

Diaz argues that the testimony of Sheppard, the sexual assault nurse, violated his right to a fair trial because it was impermissible opinion testimony as to his guilt. The State responds that because Diaz did not object to this testimony below, and because Diaz has not shown

No. 41999-8-II

manifest error affecting a constitutional right, Diaz may not raise this argument for the first time on appeal. We agree with the State.[3]

A.    *Standard of Review*

The Sixth Amendment to the United States Constitution and article I, section 21 of the Washington Constitution guarantee the right to a jury trial. *State v. Elmore*, 154 Wn. App. 885, 897, 228 P.3d 760 (2010). The right to a jury trial includes the right to have the jury make an independent determination of the facts. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001). As such, opinion testimony on the guilt or veracity of the defendant, or the veracity of the victim, generally violates the right to a jury trial. *State v. Kirkman*, 159 Wn.2d 918, 927-28, 155 P.3d 125 (2007); *Demery*, 144 Wn.2d at 759. But a witness does not give improper opinion testimony merely because the testimony expresses an opinion as to an ultimate issue of fact that the jury must decide. *Kirkman*, 159 Wn.2d at 929.

In addition, "Under ER 704, a witness may testify as to matters of law, but may not give legal conclusions. Improper legal conclusions include testimony that a particular law applies to the case, or testimony that the defendant's conduct violated a particular law." *State v. Olmedo*, 112 Wn. App. 525, 532, 49 P.3d 960 (2002) (citations omitted). Many Washington courts that have addressed this issue in criminal cases have treated it as an evidentiary matter, not a question

---

[3] The State also claims that any error on this point was invited because defense counsel assented to it. We disagree. The invited error doctrine precludes a party from setting up an error at trial and then assigning error to it on appeal. *State v. Momah*, 167 Wn.2d 140, 153, 217 P.3d 321 (2009). An error may be invited if affirmatively assented to. *See Momah*, 167 Wn.2d at 154. But Diaz did not affirmatively assent to Sheppard's testimony. After the voir dire of Sheppard, the trial court asked whether Diaz had any objections to the proffered testimony. Defense counsel replied, "I don't believe so, Your Honor. Think that's it." 4 Report of Proceedings (RP) at 550. The State is incorrect that defense counsel affirmatively assented to Sheppard's testimony; the invited error doctrine does not apply.

8

of constitutional law. *See, e.g., State v. Black,* 109 Wn.2d 336, 348-49, 745 P.2d 12 (1987); *In re Det. of Bedker,* 134 Wn. App. 775, 777, 146 P.3d 442 (2006). But logically speaking, if an expert offers the opinion that the defendant is guilty of a crime, the expert has rendered an opinion as to the defendant's guilt, violating the right to a jury trial.

Diaz did not object to any of the purportedly improper opinion testimony at trial. And a claim of improper opinion testimony may be raised for the first time on appeal only if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3); *Kirkman,* 159 Wn.2d at 926-27. "Manifest error" requires a showing of actual prejudice to the defendant's constitutional rights at trial. *Kirkman,* 159 Wn.2d at 926-27. Such prejudice can only be shown with regard to opinion testimony when the statement was an "'explicit or almost explicit'" opinion on the defendant's guilt or the victim's veracity. *State v. King,* 167 Wn.2d 324, 332, 219 P.3d 642 (2009) (quoting *Kirkman,* 159 Wn.2d at 936).

B.    *Sheppard's Testimony*

At trial, Sheppard testified that LS had erythemas (areas of reddened skin that typically become bruises) on her right arm, on her shoulder, on the back of her neck, and on her left leg. Sheppard also testified that LS had tears to her fossa navicularis and labia minora.[4] Sheppard testified that tears to the fossa navicularis are normal. She testified that such tears usually occur during trauma and birth, and can occur during consensual sex. Sheppard further testified that the labia minora is thicker and can tear for the same reasons as the fossa navicularis, including trauma and birth.

---

[4] The fossa navicularis is an area of thin skin around the opening of the vagina. The labia minora are the inner folds of the perineal opening.

Later, the State again asked about the causes of tears to the labia minora. Sheppard replied:

> It occurs, in my practice, most of the time in sexual assaults and also in birth. That's what I see mostly. It also can occur sometimes when we have, especially in pediatrics, straddle injury type trauma. Kids falling off bikes onto the bar of the bike is typical, or falling onto a fence post, that sort of thing. Just, you know, you'd have to stretch your imagination around. There's quite a lot of different instances. Anything that could cause it to stretch beyond its capacity, it will tear.

4 Report of Proceedings (RP) at 544. Defense counsel did not object. The State again asked whether tears to the labia minora occur during sexual intercourse, to which Sheppard replied that such injuries were not usual, but possible. The State asked Sheppard to clarify, and she began to testify, "If it's an invited coitus basic—" at which point defense counsel objected and the trial court sustained the objection. 4 RP at 544-45.

In response to a subsequent objection by defense counsel on another matter, the trial court excused the jury and allowed the State to voir dire Sheppard. During this voir dire, the State asked Sheppard whether LS's injuries were consistent with being forcibly held down, with being bitten, and with being thrown on her back. Defense counsel stated that she had no objections. Once the jury returned to the courtroom, the State repeated the same line of questioning, eliciting Sheppard's testimony that LS's injuries were consistent with being forcibly held down, with being bitten, with being thrown onto her back, and with being forcibly held onto her back. Defense counsel did not object.

C.    *Diaz Has Not Shown Manifest Error*

Diaz argues that Sheppard gave improper opinion testimony because she testified that she typically saw tears to the labia minora from "sexual assault," and LS had injuries consistent with being "forcibly" held down. Br. of Appellant at 16. Diaz contends that this testimony constituted impermissible testimony as to his guilt because he was charged with rape by forcible compulsion. But because Sheppard's testimony was not an explicit or nearly explicit comment on Diaz's guilt, Diaz has failed to show manifest error and may not raise this issue for the first time on appeal.

"In general, testimony deemed to be an opinion as to a defendant's guilt must relate directly to the defendant." *State v. Sanders*, 66 Wn. App. 380, 387, 832 P.2d 1326 (1992). An expert who testifies that a victim's examination results are consistent with sexual assault, without opining that the defendant committed the assault, does not offer an explicit or almost explicit comment on the defendant's guilt. *See State v. Borsheim*, 140 Wn. App. 357, 375, 165 P.3d 417 (2007). Because Sheppard's testimony did not relate LS's injuries to Diaz, she did not give any explicit or almost explicit opinion on his guilt and he may not raise this issue for the first time on appeal.

III. CONFRONTATION CLAUSE

Diaz finally argues that Sheppard's testimony based on another nurse's examination of LS violated his right to confront the witnesses against him. We disagree.

The Sixth Amendment's Confrontation Clause bars the admission of the testimonial hearsay statements of a witness who does not appear at trial, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541

U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Testimonial hearsay statements include affidavits that the declarant would reasonably believe would be used at trial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11, 129 S. Ct. 2527, 2532, 174 L. Ed. 2d 314 (2009). We review a purported Confrontation Clause violation de novo. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

In *Melendez-Diaz*, the Supreme Court held that it violated the Confrontation Clause to admit affidavits submitted by analysts declaring that a substance was cocaine without the analysts' testimony. 557 U.S. at 310-11. But Division One of this court distinguished *Melendez-Diaz* in *State v. Lui*, 153 Wn. App. 304, 318-19, 221 P.3d 948 (2009), *review granted*, 168 Wn.2d 1018 (2010). In *Lui*, rather than admitting the affidavits of experts who did not testify, experts testified in court but relied on other experts' reports to do so. 153 Wn. App. at 318-19. The court held that because of this live testimony, subject to cross-examination, *Melendez-Diaz* did not bar the testimony under the Confrontation Clause. *See* 153 Wn. App. at 319.

The facts of *Lui* are somewhat different from the instant case. There, one expert witness testified as to the results of an autopsy report for an autopsy that another expert had conducted. 153 Wn. App. at 307-08. But the testifying expert was the report author's supervisor, and he had discussed the report with the author and signed off on the author's conclusions. 153 Wn. App. at 308. Another expert witness testified that DNA (deoxyribonucleic acid) profiles from two different samples matched, although the expert had not performed the testing on either sample. 153 Wn. App. at 310-12.

Diaz argues that *Lui* is distinguishable from the instant case because, unlike in *Lui*, Sheppard did not supervise the creation of the report that she relied on at trial. While Diaz is

correct about the facts of the instant case, he is mistaken about the holding of *Lui*. While the expert testifying about the autopsy report in *Lui* had supervised its author, the expert testifying about the DNA results merely reviewed the results produced by others. 153 Wn. App. at 308-12. The *Lui* court did not rely on any supervisory role on the part of either expert to uphold the admission of their testimony. Rather, the court relied on the fact that both experts had used their independent expertise to draw conclusions from the reports prepared by others, and both were subject to cross-examination. 153 Wn. App. at 319. So too here, although Sheppard testified based on another nurse's examination of LS, she used her own expertise to evaluate what the injuries showed, and she was subject to cross-examination.

Diaz also cites *State v. Hopkins*, 134 Wn. App. 780, 789-91, 142 P.3d 1104 (2006), *review denied*, 160 Wn.2d 1020 (2007), which excluded an expert's testimony as to another expert's examination results. But *Hopkins* is distinguishable from both *Lui* and the instant case. There, a nurse practitioner who performed a sexual assault exam on the victim had a family emergency and could not testify at trial. 134 Wn. App. at 784. The practitioner's supervisor instead "relat[ed] the contents" of the nurse's report to the jury. 134 Wn. App. at 784. The *Lui* court thus noted that in *Hopkins*, "there is no suggestion that the doctor did anything other than read the nurse's statements to the jury." 153 Wn. App. at 321 n.16.

In *Lui* and here, the experts did more than act as "mere conduits for the testimonial assertions" of other experts. 153 Wn. App. at 320. In *Lui*, the expert testifying about the autopsy used his own expertise and independent review of the data to reach his conclusions. 153 Wn. App. at 320. And the expert testifying about the DNA match used her own expertise to interpret the data generated by others. 153 Wn. App. at 320-21. So too here, Sheppard used her

own expertise to draw conclusions regarding the possible causes of LS's injuries; she did not simply relate the findings of the non-testifying nurse. Thus, under *Lui*, Sheppard's testimony did not violate the Confrontation Clause.

Furthermore, the United States Supreme Court's recent decision in *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012), although lacking a majority rationale, supports the outcome of *Lui*. In *Williams*, a witness testified at a bench trial that a suspect's DNA profile matched a profile produced by another expert who did not testify. 132 S. Ct. at 2229-30. A plurality of the Court held that when an expert witness relies on another expert's report in order to form an opinion, the information from such a report is not offered for the truth of the matter asserted, but only to explain the basis for the expert's opinion. 132 S. Ct. at 2228. Hence, under the plurality's reasoning, such testimony is not hearsay and does not violate the Confrontation Clause's prohibition on testimonial hearsay.[5] *See* Fed. R. Evid. 801 (hearsay is a statement made out of court and offered to prove the truth of the matter asserted); ER 801 (same).

Justice Thomas concurred in the judgment only, opining that the non-testifying expert's report was offered for the truth of the matter, but it was not testimonial because it was unsworn and uncertified. 132 S. Ct. at 2259-60 (Thomas, J., concurring). Justice Kagan, joined by three other justices, dissented, pointing out that the plurality and concurrence created "five votes to approve the admission of [the non-testifying expert's report] but not a single good explanation."

---

[5] The plurality also opined in dicta that, had the trial been a jury trial, the non-testifying expert's report would not have been admissible absent "an evaluation of the risk of juror confusion and careful jury instructions" to ensure that the jury did not consider the non-testifying expert's report for the truth of the matter asserted. *Williams*, 132 S. Ct. at 2236. But because this statement was dicta within a plurality, it does not control the outcome of the instant case.

132 S. Ct. at 2265 (Kagan, J., dissenting).  *Williams* is consistent with the result in *Lui* as to the Sixth Amendment right to confront witnesses.[6]

Because Sheppard testified as to her own expert opinion based on another expert's report, and because she was subject to cross-examination, Diaz's confrontation rights were not violated. His argument to the contrary fails.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, C.J.

Hunt, J.

---

[6] Diaz notes that the Washington Constitution may provide greater protection against testimonial hearsay than the federal constitution, citing *State v. Shafer*, 156 Wn.2d 381, 391-92, 128 P.3d 87 (2006).  But Diaz provides no argument that the Washington Constitution provides greater protection in this particular case, and thus we do not address the issue.

No. 41999-8-II

BJORGEN, J. (concurring) — I agree with the results and analyses in the majority opinion, but wish to add a point on the issues surrounding the deportation of Julian Zamora.

In denying defendant's motion to dismiss, the trial judge concluded that the evidence was insufficient to show that the failure by the State to arrange for transporting Zamora had a causal relationship with his deportation by the federal government. The majority opinion properly upholds this conclusion.

The categorical nature of the July 12 transport order, though, and the uncertain evidence of the State's response to it warrant further comment. As the majority holds, the evidence concerning the deportation does not sustain dismissal under CrR 8.3(b), largely, in my view, because it does not establish when Zamora was in fact deported. The evidence does show, however, that a material witness warrant was issued on July 9 and a transport order on July 12. In the transport order the superior court stated that the "Clark County Sheriff's Department, in conjunction with any other state law enforcement agency necessary, will transport" Zamora from ICE (Immigration and Customs Enforcement) in Tacoma to the Clark County Jail. Clerk's Papers (CP) at 440. The order further specified that Zamora "is to be transported to Clark County immediately, on the scheduled pickup routes, and in no case any later than August 1, 2010." CP at 440-41.

The State did not comply with the transport order. Instead, as detailed in the majority opinion, the record shows that the Clark County Jail would not transport Zamora without "paperwork" from the prosecutor and, ultimately, that it would not transport Zamora at all, because it would be for a private attorney. CP at 440. By July 19, Zamora had been deported.

16

No. 41999-8-II

The record indicates that the testimony to be provided by Zamora would have been favorable to the defendant.

All we know about the deportation is that it occurred by July 19. If much earlier than that, the State's failure to comply with the transport order would have had no consequences. If deportation occurred on or just before that date, though, the legal topography of this case would be changed. The failure to comply with the transport order under those circumstances, in my view, could raise issues under the compulsory process clause of the Sixth Amendment to the United States Constitution or the due process clause of the Fourteenth Amendment by analogy to cases such as *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982). Although *Valenzuela-Bernal* involved federal deportation of potential witnesses in a federal prosecution, its rationale could reach situations where but for noncompliance with a state court order, a potentially exculpatory witness would not have been deported. Those circumstances are not established here. It bears making clear, though, that in some circumstances, the failure to comply with a transport order may carry constitutional risks.

BJØRGEN, J.