[No. 67706-3-I.   Division One.   February 19, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. FABIAN D. MANION, *Appellant*.

612

*Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Samantha D. Kanner, Deputy*, for respondent.

¶1 Cox, J. — Fabian Manion appeals his order of disposition for unlawful possession of a firearm. He claims that his Sixth Amendment right to confront witnesses against him was violated by the admission of DNA (deoxyribonucleic acid) evidence at his fact-finding hearing. He also claims that there was insufficient evidence to support his conviction.

¶2 The DNA expert who testified at the fact-finding hearing was the technical peer reviewer of the evidence originally examined by another analyst. The other analyst was unavailable as a witness for the hearing. The expert who testified at the hearing conducted an independent review of the DNA evidence and gave her independent opinion. This opinion was consistent with the conclusions of the unavailable witness. Based on this record, we conclude that there was no violation of the Confrontation Clause.[1] We also conclude there was sufficient evidence to support this conviction. We affirm.[2]

¶3 In November 2009, four police officers in an unmarked police vehicle were patrolling an area near a Seattle nightclub. The officers saw three African-American males, who were later identified as Jeffrey Banks, K'Breyan Clark, and Fabian Manion. The three were walking away from the nightclub and displayed what the officers interpreted as gang signs to another group outside the nightclub.

---

[1] U.S. Const. amend. VI.

[2] We deny the State's motion to strike a portion of appellant's reply brief.

¶4 The officers noticed that Clark's jacket tilted to the right and bulged as if a heavy object was in his right jacket pocket. The officers also observed Clark put his hand in and take it out of his pocket multiple times.

¶5 With their vehicle's headlights on, the police officers followed Manion and the other two. The three reacted by quickening their pace to a run and then turning behind the north side of a building. The officers temporarily lost sight of them at this point.

¶6 When the officers again spotted the three, they saw Clark and Manion standing near a long hedge of bushes on the north side of the building. Both stood facing the bushes near each other. The officers saw Clark make "a furtive movement in a manner indicating that he was depositing something in the bushes."

¶7 One officer saw Banks turn left along the north side of the building and run south along its west side. The officer also saw Banks "slough an object into a bush" near the southwest corner of the building.

¶8 The officers stopped the three and ordered them to lie flat on the ground. They complied. One officer located a .40 caliber firearm in the bushes near the southwest corner of the building. At this point, Banks jumped up and ran, but another officer apprehended him.

¶9 Two officers found two more firearms in the bushes along the north side of the building. They found a .22 caliber firearm in the bushes near where Manion had been standing before being ordered to the ground. They also found a .38 caliber firearm where they saw Clark making furtive movements.

¶10 Manion was 16 years old at the time of the incident. The State charged him with second degree unlawful possession of a firearm in juvenile court.

¶11 At the fact-finding hearing, the court admitted DNA evidence from the .22 caliber firearm that had been tested at the Washington State Patrol Crime Lab. That evidence

showed a DNA typing profile obtained from this firearm that was a trace mixture consistent with having originated from two individuals. Manion was included as a possible contributor. The evidence further showed that based on the United States population, 1 in 2,200 individuals was a potential contributor to this mixed profile.

¶12 The trial court found Manion guilty of the offense charged. The court ordered Manion to serve 10 days in detention, pay a crime victim assessment fee, and comply with other conditions.

¶13 Manion appeals.

## CONFRONTATION CLAUSE

¶14 Manion first argues that his Sixth Amendment right to confront the witnesses against him was violated because the DNA technical peer reviewer who testified at the fact-finding hearing was not the analyst who originally tested the evidence. We hold that there was no violation of the Confrontation Clause in this case.

¶15 The Sixth Amendment Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[3] " '[T]he principal evil at which the clause was directed was the civil-law system's use of ex parte examinations and ex parte affidavits as substitutes for live witnesses in criminal cases.' "[4] This practice "denies the defendant the opportunity to test his accuser's assertions 'in the crucible of cross-examination.' "[5]

¶16 In *Crawford v. Washington*, the United States Supreme Court held that the right to confrontation renders

---

[3] U.S. Const. amend. VI.

[4] *State v. Jasper*, 158 Wn. App. 518, 526, 245 P.3d 228 (2010) (*Jasper* I), aff'd, 174 Wn.2d 96, 271 P.3d 876 (2012) (*Jasper* II) (alteration in original) (internal quotation marks omitted) (quoting *State v. Lui*, 153 Wn. App. 304, 314, 221 P.3d 948 (2009), *review granted*, 168 Wn.2d 1018 (2010)).

[5] *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)).

"testimonial" statements by a nontestifying witness inadmissible unless the witness is unavailable and previously subject to cross-examination by the defendant.[6]

¶17 This court reviews de novo an alleged violation of the Confrontation Clause.[7]

¶18 In *State v. Lui*, this court addressed whether Sione Lui's Sixth Amendment right to confront witnesses against him was violated because two testifying expert witnesses partially relied on forensic evidence that others developed.[8] There, one testifying expert was a pathologist.[9] The other was an expert on DNA evidence.[10]

¶19 The pathologist who conducted the autopsy on the victim was unavailable to testify at trial because he had relocated to Nevada and was testifying in another case.[11] Instead, the pathologist's supervisor who had reviewed and cosigned the autopsy report testified at trial.[12] According to this testifying witness, cosigning the autopsy report meant that the supervisor " 'reviewed the report, the photographs, the materials collected, as evidence.' "[13] Further, the supervisor " 'discussed the case with the principal pathologist' " and " 'signed [the report] to indicate that [he] agree[d] with the findings.' "[14]

---

[6] 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[7] *Jasper II*, 174 Wn.2d at 108.

[8] 153 Wn. App. 304, 306, 221 P.3d 948 (2009), *review granted*, 168 Wn.2d 1018 (2010).

[9] *Id.* at 307-08.

[10] *Id.* at 310.

[11] *Id.* at 307.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 307-08.

¶20 The other expert witness who testified at trial was a laboratory technician who testified about DNA testing.[15] This technician was an associate director of a private DNA testing company that had tested some of the DNA taken from the victim in that case.[16] She did not personally conduct the tests, but she reviewed the notes and reports of the nontestifying technicians who had done the DNA testing.[17] This expert also "testified about the laboratory's chain of custody procedures, the protocols and tests involved, laboratory technician training and certification, and other quality assurance measures."[18]

¶21 This court considered and rejected Lui's claim that admission of the testimony of these two experts violated the Confrontation Clause under *Crawford* and *Melendez-Diaz v. Massachusetts*.[19] Specifically, his claim was that both testifying witnesses relied on forensic evidence developed by others who did not testify at trial and he had no opportunity to cross-examine them.[20]

¶22 In rejecting this claim, this court distinguished *Melendez-Diaz*.[21] In *Melendez-Diaz*, the Supreme Court held that "certificates of analysis" that stated that a substance seized by law enforcement was in fact cocaine were testimonial statements.[22] "Absent a showing that the analysts [who created the certificates] were unavailable to testify at trial **and** that [Melendez-Diaz] had a prior

---

[15] *Id*. at 310-12.

[16] *Id*. at 310.

[17] *Id*.

[18] *Id*.

[19] 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

[20] *Lui*, 153 Wn. App. at 313.

[21] *Id*. at 316-19.

[22] *Melendez-Diaz*, 557 U.S. at 311.

opportunity to cross-examine them, [Melendez-Diaz] was entitled to 'be confronted with' the analysts at trial."[23]

¶23 In *Lui*, this court pointed out material factual distinctions between *Melendez-Diaz* and that case. This court explained that in *Lui* neither the autopsy report nor the DNA report were offered into evidence in lieu of live testimony.[24] Rather, each expert testified at trial to his or her own opinions and conclusions.[25] Each expert testified extensively about his or her own expertise, the protocols and procedures used in their respective offices, and the tests employed.[26]

¶24 In response to Lui's claim that each testifying expert simply served as "surrogates for the true witnesses against him," this court disagreed.[27] This court stated that its review of the record indicated that the experts presented their independent opinions:

> [The pathologist] testified based on his own expertise in strangulation and his ***independent review*** of the autopsy photographs and other data recorded in the autopsy report. Similarly, [the DNA expert] testified based on her ***own interpretation*** of the machine-generated raw data. Both experts applied ***significant expertise to interpret and analyze*** the underlying data. And neither witness simply read to the jury from [the original pathologist's] and the DNA laboratory technicians' reports. Indeed, [the DNA expert] deviated from her laboratory's written report when it conflicted with her own opinion. This is not a case where the State produced expert witnesses simply to have them recite out-of-court statements made by others as a way to evade the protections of the confrontation clause.[28]

---

[23] *Id.* (internal quotation marks omitted) (quoting *Crawford*, 541 U.S. at 54).

[24] *Lui*, 153 Wn. App. at 318-19.

[25] *Id.* at 319.

[26] *Id.*

[27] *Id.* at 319-20.

[28] *Id.* at 320-21 (emphasis added) (footnote omitted).

Based on that record, this court then concluded that the testifying experts had independently reviewed the evidence on which they testified at trial and reached their own conclusions.[29] Thus, they were subject to cross-examination at trial and there was no Confrontation Clause violation.[30]

¶25 This court further concluded that these testifying experts could partially rely on the reports of others because Evidence Rule 703 permits an expert to base his or her opinion on facts or data that are not admissible.[31] Thus, this court also concluded that the Confrontation Clause does not bar the admission of testimonial statements if they are offered " 'for purposes other than establishing the truth of the matter asserted.' "[32]

## Independent Opinion

¶26 Manion chiefly relies on *Bullcoming v. New Mexico*,[33] a United States Supreme Court case that was handed down after this court decided *Lui* to support his claim that his Sixth Amendment right to confront was violated. We next consider *Bullcoming* and distinguish it from this case.

¶27 In *Bullcoming*, Donald Bullcoming was charged with driving while intoxicated (DWI).[34] A forensic laboratory report certifying that his blood alcohol concentration was above the threshold for aggravated DWI was the principal evidence against him.[35] At trial, the State failed to call as a witness Curtis Caylor, the analyst who performed the blood alcohol test and who signed the certification of

---

[29] *Id.*

[30] *Id.* at 319.

[31] *Id.* at 321-23.

[32] *Id.* at 322-23 (quoting *Crawford*, 541 U.S. at 59 n.9).

[33] __ U.S. __, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011).

[34] *Id.* at 2709.

[35] *Id.*

results.[36] Caylor was on " 'unpaid leave' for a reason not revealed."[37] Instead, the State called Gerasimos Razatos, "another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample."[38] A jury convicted him of aggravated DWI, and the state court of appeals affirmed.[39] The New Mexico Supreme Court then concluded that live testimony of another analyst was sufficient under the Confrontation Clause.[40]

¶28　The United States Supreme Court granted certiorari and stated the issue presented in that case as "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."[41] The Court held that the surrogate testimony in that case did not meet the requirements of the Constitution.[42]

¶29　In discussing *Crawford* and its progeny, a majority of the Court concluded that the blood-alcohol analyst's report, which was prepared for a criminal investigation and prosecution, was "testimonial," implicating the protections of the Confrontation Clause.[43] The Court noted that the State never asserted that Caylor, the analyst who performed the test and who signed the certification, was

---

[36] *Id.*

[37] *Id.* at 2712.

[38] *Id.* at 2709.

[39] *Id.* at 2712.

[40] *Id.* at 2712-13.

[41] *Id.* at 2710.

[42] *Id.*

[43] *Id.* at 2717.

unavailable as a witness at trial.[44] The Court then discussed why Razatos, the testifying expert at that trial, could not supply the information necessary to satisfy the requirements of the Confrontation Clause:

> But surrogate testimony of the kind Razatos was equipped to give could not convey what Caylor knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part. Significant here, Razatos had no knowledge of the reason why Caylor had been placed on unpaid leave. With Caylor on the stand, Bullcoming's counsel could have asked questions designed to reveal whether incompetence, evasiveness, or dishonesty accounted for Caylor's removal from his work station. Notable in this regard, the State never asserted that Caylor was "unavailable"; the prosecution conveyed only that Caylor was on uncompensated leave. ***Nor did the State assert that Razatos had any "independent opinion" concerning Bullcoming's BAC*** [blood alcohol content].[45]

¶30 Significantly, Justice Sotomayor agreed that the trial court had erred by admitting the blood alcohol concentration report in that case.[46] But in doing so, she expanded on the majority's acknowledgement of the limited nature of its decision.[47] In her special concurrence, she highlighted a series of factual circumstances that *Bullcoming* and *Melendez-Diaz* did not present, including the following:

> Second, this is not a case in which the person testifying is a supervisor, ***reviewer***, or ***someone else with a personal, albeit limited, connection to the scientific test at issue***. Razatos conceded on cross-examination that he played no role in producing the BAC report and did not observe any portion of Curtis Caylor's conduct of the testing. The court below also

---

[44] *Id.* at 2714.

[45] *Id.* at 2715-16 (emphasis added) (footnotes omitted).

[46] *Id.* at 2719 (Sotomayor, J., concurring).

[47] *Id.* at 2722 (Sotomayor, J., concurring).

recognized Razatos' total lack of connection to the test at issue. It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results. *We need not address what degree of involvement is sufficient because here Razatos had no involvement whatsoever in the relevant test and report.*[48]

¶31 Based on our reading of *Bullcoming*'s majority opinion and the special concurrence by Justice Sotomayor, we conclude that there are circumstances where an expert may testify at trial, partially relying on the forensic work of others, without violating the protections of the Confrontation Clause. For example, the majority in *Bullcoming* drew a distinction between the testimony in that case and where the testifying expert expresses an " 'independent opinion.' "[49] Likewise, as Justice Sotomayor states in her concurrence, the latter type of expert testimony may be proper where it is either by a "reviewer" of the original testing or by "someone else with a personal, albeit limited, connection to the scientific test at issue."[50] She thus suggests that the question of the degree of involvement in the original testing of the testifying witness is something that should be determined on a case by case basis.[51]

¶32 In determining whether this case fits within those circumstances where a testifying expert may partially rely on the forensic work of others, we must first address whether the underlying work of others is testimonial. Here, Manion argues that forensic scientist Jennifer Reid's draft report of the underlying DNA analysis was testimonial. We agree.

---

[48] *Id.* (Sotomayor, J., concurring) (emphasis added) (citations omitted).

[49] *Id.* at 2716.

[50] *Id.* at 2722 (Sotomayor, J., concurring).

[51] *Id.* (Sotomayor, J., concurring).

¶33 The Confrontation Clause applies only to testimonial statements or materials.[52] A "testimonial statement" is a " 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' "[53] The United States Supreme Court has listed "three possible formulations for the 'core class' of testimonial statements":

"[(1)] *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [(2)] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [(3)] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[54]

The State has the burden of establishing that a statement is nontestimonial.[55]

¶34 Based on these authorities, Reid's draft report of the DNA analysis is testimonial because it falls into the third formulation of testimonial statements. After Manion was arrested and before the fact-finding hearing, Reid conducted DNA analysis to determine whether there was a high probability that Manion was a contributor to the DNA found on the .22 caliber firearm. She prepared a draft report of the procedures she followed and of her findings.

¶35 At this fact-finding hearing, Reid's draft report was neither offered nor admitted into evidence. Nevertheless, Manion claims that the testimony of Katherine Woodard, the expert who testified at this fact-finding hearing about

---

[52] *State v. Doerflinger*, 170 Wn. App. 650, 655, 285 P.3d 217 (2012).

[53] *Jasper* I, 158 Wn. App. at 526 (internal quotation marks omitted) (quoting *Crawford*, 541 U.S. at 51).

[54] *Id.* at 527 (alterations in original) (internal quotation marks omitted) (quoting *Crawford*, 541 U.S. at 51-52).

[55] *State v. Koslowski*, 166 Wn.2d 409, 417 n.3, 209 P.3d 479 (2009).

the DNA evidence, denied him his right to confrontation because Woodard relied on the testimonial forensic work that Reid performed.[56] Manion chiefly relies on *Bullcoming* to support this argument. That reliance is misplaced.

¶36 First, *Bullcoming* and this case are factually distinguishable. As we discussed earlier in this opinion, Reid's draft report was testimonial but never admitted into evidence. Thus, this case is unlike the factual situation in *Bullcoming*, where testimonial documents were admitted at trial to assist the prosecution in proving guilt.[57] We note further that this record establishes that Reid was unavailable to testify at the fact-finding hearing due to medical leave, unlike the analyst in *Bullcoming* who was on unpaid for leave for an undisclosed reason.[58] These are material factual distinctions between *Bullcoming* and this case.

¶37 Second, neither *Bullcoming* nor *Melendez-Diaz* addresses the issue in this case: whether an expert who testifies at trial may partially rely on forensic material developed by others in rendering an independent opinion without violating the Confrontation Clause. The former case involved a testifying witness at trial who was familiar with the laboratory's testing procedures, but who had neither participated in nor observed the test on Bullcoming's blood sample.[59] There was no indication in that opinion that the testifying expert rendered an independent opinion.[60] The latter case involved a document admitted in lieu of live testimony from the person who certified the contents of the document.[61]

¶38 Here, the testimony of police witnesses and Woodard established the chain of custody of the .22 caliber firearm

---

[56] Appellant's Opening Brief at 11-14.

[57] *See Bullcoming*, 131 S. Ct. at 2709-10.

[58] *See id.* at 2712.

[59] *Id.* at 2713, 2715.

[60] *Id.* at 2716.

[61] *Melendez-Diaz*, 557 U.S. at 329.

submitted to the Washington State Patrol Crime Lab for DNA testing. The record also establishes that the Crime Lab's forensic scientist Reid conducted the DNA testing and the original analysis of the .22 caliber firearm recovered at the time of Manion's arrest. Based on that analysis, Reid prepared a draft report of her findings for technical peer review.

¶39 Woodard was the technical peer reviewer of the draft report finding that Reid prepared. After satisfying herself that she agreed with Reid's analysis and conclusions, Woodard cosigned this draft report.

¶40 At the fact-finding hearing, Woodard testified, in detail, to her independent review and how she reached her independent opinion about the DNA analysis to which she testified. Her testimony traced the DNA testing process from obtaining a trace sample of the object analyzed, to capillary electrophoresis by the use of a computer, to the analysis of the data derived from the prior steps. Woodard both analyzed the computer generated data and evaluated for correctness the prior steps in the process. Specifically, the record shows that Woodard reviewed Reid's detailed case file, which included handwritten notes, worksheets, photographs, and Reid's draft report. The case notes helped demonstrate Reid's "train-of-thought" during the testing. After this review, Woodard came to her own independent opinion that Manion was a likely contributor to the DNA mixture.

¶41 Woodard's testimony shows that she was significantly involved in the DNA testing process as the technical peer reviewer. In contrast to *Bullcoming*, this is not a case where the testifying witness had little or no involvement in the process before trial.[62]

¶42 More importantly, Woodard rendered her independent opinion of the DNA analysis, which in this case was consistent with the findings of Reid. Woodard did not

---

[62] *See Bullcoming*, 131 S. Ct. at 2709.

merely "parrot" the findings of Reid as shown by the following excerpt of testimony:

Q. And as a peer reviewer, what do you do after analyzing that paperwork?

A. I ensure that I agree with the conclusions that were devised by the analysts themselves and make sure I agree that their conclusion is supported by the analysis.

Q. So you're not merely reading her final conclusion paperwork and signing your name off on it; is that correct?

A. Correct, I have to agree that it is properly supported by the work that was done and case law.

Q. And in order to agree that the work is properly supported, you have to conduct your own analysis of the information?

A. I have to agree with all of the analysis that she did, correct.

Q. And as a peer reviewer, what do you do after you analyze the paperwork?

A. After all of that is performed, I will go through the report and make sure that everything has been accounted for and there is nothing I feel requires further testing, and after all of that is completed if there are no issues I need to bring up with the analyst, then I will sign the case off.

Q. And when you say that you're looking over a report looking to make sure everything is accounted for, what are you specifically looking for?

A. That each item on the original request is listed on the report itself and also that every different step of the testing process is listed in the report as well and that the results and that the conclusions that were formed during that analysis are also accurately listed.

Q. And what do you do after that?

A. After that, I will send the case file off as well as sign it as technically reviewed in our computer program that we have.[63]

¶43 The "independent opinion" or "independent-judgment" approach illustrated by Woodard's testimony is not

---

[63] Report of Proceedings (Apr. 26, 2011) at 86-87.

new, as Justice Breyer explained in his concurrence in *Williams v. Illinois*.[64] He cited *The New Wigmore: A Treatise on Evidence: Expert Evidence* to describe the variety of approaches that courts have used to determine "when testifying experts may rely on testing results or reports by nontestifying experts."[65]

¶44 In describing the "independent-judgment test," *Wigmore* notes that "courts have focused on the question of whether the testifying expert is merely parroting the original analyst's report, or instead is engaged in the exercise of independent expert judgment."[66] "Consistent with this analysis, the dominant approach of the lower courts has been to look to [(1)] the quality of the nontestifying expert's report, [(2)] the testifying expert's involvement in the process, and [(3)] the consequent ability of the testifying expert to use independent judgment and interpretative skill."[67] Thus, a defendant's confrontation right is not violated if he or she has the opportunity to cross-examine a testifying expert who uses his or her independent judgment. Further, the testifying expert may base his or her opinion on a nontestifying expert's testimonial statement, so long as the testifying expert has exercised independent judgment.[68]

¶45 For these reasons, we conclude that the admission of Woodard's expert testimony did not violate the Confrontation Clause in this case. She independently reviewed the draft report that Reid prepared, exercised her independent judgment, and then cosigned that report prior to the hear-

---

[64] ___ U.S. ___, 132 S. Ct. 2221, 2247, 183 L. Ed. 2d 89 (2012) (Breyer, J., concurring).

[65] *Id.* (citing DAVID H. KAYE ET AL., THE NEW WIGMORE: A TREATISE ON EVIDENCE: EXPERT EVIDENCE § 4.11.6 (2d ed. Supp. 2012).

[66] KAYE ET AL., *supra*, § 4.11.6 (citing *State v. Mitchell*, 2010 ME 73, 4 A.3d 478, 490; *Commonwealth v. Avila*, 454 Mass. 744, 912 N.E.2d 1014, 1029 (2009); *People v. Lovejoy*, 235 Ill. 2d 97, 919 N.E.2d 843, 864, 335 Ill. Dec. 818 (2009); *Vann v. State*, 229 P.3d 197, 200 (Alaska Ct. App. 2010)).

[67] *Id.* § 4.10.2 (footnote omitted) (citing *Lui*, 153 Wn. App. at 317-21).

[68] *Id.*

ing in this case. At the fact-finding hearing, she expressed her independent opinion about the DNA evidence based on her technical peer review of Reid's work. This satisfies the requirements of the Confrontation Clause.

¶46 Manion argues that the trial court's findings of fact are presented as if Reid testified at trial, which evidences a violation of the Confrontation Clause. While the findings state that Reid conducted the initial DNA testing, the findings also state that Reid was on "extended medical leave" and Woodard performed a peer review of Reid's DNA testing. Significantly, the findings contain the following summary: "Based on Forensic Scientist Woodard's own training and experience with DNA analysis and her review of the DNA data collected by Forensic Scientist Reid, Forensic Scientist Woodard concurred with Forensic Scientist Reid's DNA analysis conclusions."[69] The findings demonstrate that Woodard provided an independent opinion. Thus, this argument is not persuasive.

### Testimonial Statements Offered for a Purpose Other Than the Truth of the Matter

¶47 Manion and the State offer conflicting views regarding the impact of a recent United States Supreme Court case, *Williams*,[70] which was decided in June 2012 after *Bullcoming*. The State argues that the plurality's lead opinion, together with Justice Thomas's special concurrence, supports the conclusion that there was no violation of the Confrontation Clause in this case.[71] In contrast, Manion argues that *Williams* has little bearing on this case because the DNA testing evidence done by the nontestifying witness in this case was admitted and relied on for its truth.[72] We largely

---

[69] Clerk's Papers at 41.

[70] 132 S. Ct. 2221 183 L. Ed. 2d 89 (2012).

[71] Brief of Respondent at 30-31.

[72] Appellant's Reply Brief at 7-14.

disagree with both of these arguments and reach our own conclusions about *Williams* in the discussion that follows.

¶48 Sandy Williams was convicted of rape and other charges following a bench trial in Chicago, Illinois.[73] At trial, the prosecution called an expert who testified that a DNA profile produced by a private accredited laboratory matched a profile produced by the state police lab.[74] The expert, Sandra Lambatos, worked at the state police lab and was not involved in the testing at the private laboratory, Cellmark.[75] Williams argued that Lambatos's testimony regarding Cellmark's testing violated the Confrontation Clause.[76] The state courts disagreed.[77]

¶49 The United States Supreme Court granted certiorari.[78] In concluding that there was no Confrontation Clause violation, four of the justices agreed with two different rationales in the lead opinion, authored by Justice Alito.[79] Justice Thomas concurred in the judgment but disagreed with the lead opinion's rationale.[80] Four justices signed a dissenting opinion, authored by Justice Kagan.[81]

¶50 For purposes of this case, we focus on the first rationale of the lead opinion in *Williams*:

> We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the

[73] *Williams*, 132 S. Ct. at 2229, 2231.

[74] *Id.* at 2229-30.

[75] *Id.* at 2229.

[76] *Id.* at 2231.

[77] *Id.*

[78] *Id.*

[79] *Id.* at 2227-28.

[80] *Id.* at 2255 (Thomas, J., concurring).

[81] *Id.* at 2264 (Kagan, J., dissenting).

opportunity to cross-examine the expert about any statements that are offered for their truth. *Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.* Applying this rule to the present case, we conclude that the expert's testimony did not violate the Sixth Amendment.[82]

Despite the rationale stated in the emphasized portion of the above quotation, only four justices agreed with it. Specifically, Justice Thomas disavowed this rationale of the plurality decision:

The threshold question in this case is whether Cellmark's statements were hearsay at all. As the Court has explained, "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Here, the State of Illinois contends that Cellmark's statements—that it successfully derived a male DNA profile and that the profile came from L.J.'s swabs—were introduced only to show the basis of Lambatos' opinion, and not for their truth. In my view, however, there was no plausible reason for the introduction of Cellmark's statements other than to establish their truth.*[83]

Despite his rejection of this part of the lead opinion, he concluded there was no violation of the Confrontation Clause because, in his view, the statements were not "testimonial."[84] His view, which is not shared by any other justice, is that

[a]pplying these principles, *I conclude that Cellmark's report is not a statement by a "witnes[s]" within the meaning of the Confrontation Clause.* The Cellmark report

---

[82] *Id.* at 2228 (emphasis added).

[83] *Id.* at 2256 (Thomas, J., concurring) (emphasis added) (alterations in original) (citations omitted).

[84] *Id.* at 2260 (Thomas, J., concurring).

lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained.[85]

It was on this basis that he concurred in the judgment of the Court.

¶51 In the "dissent," which four justices signed, Justice Kagan points out why the first rationale of the lead opinion is not the law:

> The plurality's primary argument to the contrary tries to exploit a limit to the Confrontation Clause recognized in *Crawford*. "The Clause," we cautioned there, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." The Illinois Supreme Court relied on that statement in concluding that Lambatos's testimony was permissible. On that court's view, "Lambatos disclosed the underlying facts from Cellmark's report" not for their truth, but "for the limited purpose of explaining the basis for her [expert] opinion," so that the factfinder could assess that opinion's value. The plurality wraps itself in that holding, similarly asserting that Lambatos's recitation of Cellmark's findings, when viewed through the prism of state evidence law, was not introduced to establish "the truth of any . . . matter concerning [the] Cellmark" report. ***But five Justices agree, in two opinions reciting the same reasons, that this argument has no merit: Lambatos's statements about Cellmark's report went to its truth, and the State could not rely on her status as an expert to circumvent the Confrontation Clause's requirements.***[86]

¶52 After *Williams*, the question is whether the lead opinion's first rationale—that testimonial statements admitted for a purpose other than for their truth—is valid. For

---

[85] *Id*. (Thomas, J., concurring) (second alteration in original).

[86] *Id*. at 2268 (Kagan, J., dissenting) (emphasis added) (alterations in original) (citations omitted) (quoting *Crawford*, 541 U.S. at 60 n.9; *People v. Williams*, 238 Ill. 2d 125, 150, 939 N.E.2d 268, 345 Ill. Dec. 425 (2010); *Williams*, 132 S. Ct. at 2235 (lead opinion)).

the reasons explained in Justice Kagan's opinion, we think not. That is because five justices of the Court disavowed that rationale.

¶53 How does this affect this court's *Lui* opinion, to the extent that it relied on the same or a similar rationale as the lead opinion in *Williams*? Based on Justice Kagan's opinion, explaining that five justices disagree with the lead opinion's rationale, and that of Justice Thomas in that case, the continued validity of that part of *Lui* is doubtful.

¶54 Nevertheless, neither *Williams* nor any other case that the parties have cited to us undermines the *Lui* court's reliance on the "independent opinion" rationale that we discussed earlier in this opinion. The majority in *Bullcoming* acknowledged that is a distinct situation from the facts of that case.[87] Justice Sotomayor's special concurrence in that case expands on that point.[88] Thus, the "independent opinion" rationale in *Lui* stands and is sufficient for us to conclude here that there is no violation of the Confrontation Clause.

¶55 Manion argues that Justice Alito's "strained interpretation of the right to confront witnesses [in *Williams*] should not be endorsed under article I, section 22 [of the Washington Constitution], which expressly guarantees the right to confront witnesses 'face to face' . . . ."[89] Because we conclude that Justice Alito's first rationale in *Williams* is not supported by a majority of the Supreme Court, we need not address this argument.

## SUFFICIENCY OF THE EVIDENCE

¶56 Manion next argues that there was insufficient evidence to support this adjudication. We disagree.

¶57 When a defendant claims insufficiency of the evidence, we must determine whether any rational trier of

---

[87] *Bullcoming*, 131 S. Ct. at 2715-16.

[88] *Id.* at 2722 (Sotomayor, J., concurring in part).

[89] Appellant's Reply Brief at 15.

fact could find that each element of the crime or offense was proved beyond a reasonable doubt.[90] In making this determination, we view the evidence in the light most favorable to the State.[91] All reasonable inferences are drawn in favor of the State, and the evidence is interpreted most strongly against the defendant.[92] "Circumstantial evidence and direct evidence are equally reliable."[93] We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of evidence.[94]

¶58 At a fact-finding hearing in juvenile court, the trial court is required to "state its findings of fact and enter its decision on the record," including the "evidence relied upon by the court in reaching its decision[s]."[95] Unchallenged findings of fact are verities on appeal.[96] We review de novo the trial court's conclusions of law to determine if they are supported by the findings of fact.[97]

¶59 Where a trial court does not make a finding on a factual issue, we "must indulge the presumption that the party with the burden of proof failed to sustain their burden on this issue."[98] This court may look to the trial court's oral findings to aid its review if the written findings are "incomplete."[99]

¶60 To support a charge of second degree unlawful possession of a firearm, the State must prove beyond a

[90] *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980).

[91] *Id.*

[92] *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999); *State v. Joy*, 121 Wn.2d 333, 339, 851 P.2d 654 (1993).

[93] *State v. Fiser*, 99 Wn. App. 714, 718, 995 P.2d 107 (2000).

[94] *Id.* at 719.

[95] JuCR 7.11(c).

[96] *State v. Luther*, 157 Wn.2d 63, 78, 134 P.3d 205 (2006); *State v. Alvarez*, 105 Wn. App. 215, 220, 19 P.3d 485 (2001).

[97] *Bingham v. Lechner*, 111 Wn. App. 118, 127, 45 P.3d 562 (2002).

[98] *State v. Armenta*, 134 Wn.2d 1, 14, 948 P.2d 1280 (1997).

[99] *State v. Robertson*, 88 Wn. App. 836, 843, 947 P.2d 765 (1997).

reasonable doubt that the defendant was under 18 years of age and "owns, has in his or her possession, or has in his or her control any firearm."[100]

¶61 Possession of a firearm can be actual possession or constructive possession.[101] " '[C]onstructive possession can be established by showing the defendant had dominion and control over the firearm or over the premises where the firearm was found.' "[102] Actual possession means that the person charged with possession had " 'personal custody' "[103] or "actual physical possession."[104] Actual possession may be proved by circumstantial evidence.[105]

¶62 Here, Manion does not challenge the trial court's written findings of fact. Accordingly, they are verities on appeal. Instead, Manion argues that the findings of fact do not support the conclusions of law. He is mistaken.

¶63 In *State v. DuPont*, Division Two affirmed a defendant's conviction for actual possession of drugs based on circumstantial evidence.[106] There, a police officer stopped the defendant in a store.[107] While the police officer was talking to the defendant the officer heard keys drop and saw white folded paper fall to the ground.[108] But the officer did not see the items drop.[109] The officer retrieved the items and found cocaine and heroin in the white folded

---

[100] RCW 9.41.040(2)(a)(iii).

[101] *State v. Lee*, 158 Wn. App. 513, 517, 243 P.3d 929 (2010).

[102] *Id.* (quoting *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997)).

[103] *State v. Staley*, 123 Wn.2d 794, 798, 872 P.2d 502 (1994) (quoting *State v. Callahan*, 77 Wn.2d 27, 29, 459 P.2d 400 (1969)) (defining "actual possession" for unlawful possession of a controlled substance).

[104] *State v. Spruell*, 57 Wn. App. 383, 385, 788 P.2d 21 (1990) (defining "actual possession" for unlawful possession of a controlled substance).

[105] *State v. DuPont*, 14 Wn. App. 22, 25, 538 P.2d 823 (1975).

[106] 14 Wn. App. 22, 25-26, 538 P.2d 823 (1975).

[107] *Id.* at 23.

[108] *Id.*

[109] *Id.*

paper.[110] The keys fit the defendant's car, and no one else was in close proximity to the items.[111] The court concluded that there was adequate circumstantial evidence for a jury to conclude that the defendant had actual possession of the drugs.[112]

¶64 Here, as in *DuPont*, there was adequate circumstantial evidence for the trial court to conclude that Manion actually possessed the firearm. The trial court's findings of fact, viewed in the light most favorable to the State, support this conclusion of law.

¶65 Specifically, three of the trial court's findings of fact support the conclusion that Manion actually possessed the .22 caliber firearm. First, the court entered the following finding of fact about DNA analysis:

> 3. The DNA typing profile obtained from the .22 caliber handgun is a trace mixture consistent with having originated from at least two individuals. Fabian Manion is included as a possible contributor. Based on the U.S. population, it is estimated that 1 in 2,200 individuals is a potential contributor to this mixed profile.[113]

As discussed above, the State presented expert testimony that Manion was a possible contributor to the DNA found on the .22 caliber firearm.

¶66 Manion argues that the DNA evidence is "slim" and "shows, at best, that it is possible [Manion] touched this gun" and "possession requires more than touching." While Manion cites legal authority to support this assertion, he fails to cite to the record to support the assertion that this

---

[110] *Id.*

[111] *Id.*

[112] *Id.* at 25.

[113] Clerk's Papers at 40-41.

evidence proves only hat he touched the firearm. Thus, we need not address this argument.[114]

¶67 Second, the trial court entered the following finding of fact that Manion was in close proximity to the .22 caliber firearm:

> H. Officer Diamond and Pasquan then located two additional handguns in the hedge of bushes along the north side of the building. A .22 caliber handgun was located in the bushes in front of where Manion had been positioned when officers drove around the northeast corner of the building.[115]

¶68 Third, the trial court entered the following finding of fact about Manion's flight from an unmarked police vehicle:

> D. Manion, Clark, and Banks continued northbound on foot into Memorial Stadium parking lot, which is located on the northwest corner of the 5th Avenue North and Harrison Street. The officers followed behind the three in the unmarked police vehicle and had their head lights on. As the officers followed, Manion, Clark, and Banks all quickened their pace to a run and turned left along the north side of a small building located in the Memorial Stadium parking lot. Banks rounded the corner first followed by Clark and Manion. Officers all temporarily lost visual sight of the three males after the males turned left along the north side of the building.
>
> . . . .
>
> G. Officers ordered all three males to lay flat on the ground; all complied.[116]

During the court's oral findings of fact, the trial court stated:

> So one of the three discarded the firearm as they went around the building. They discarded the firearm because they were being followed and they thought they were being followed

---

[114] *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); RAP 10.3(a).

[115] Clerk's Papers at 40.

[116] *Id.*

by the police or someone else. I can't say beyond a reasonable doubt. It's likely they thought they were being followed by the authorities or they wouldn't have had an incentive to ditch three firearms.[117]

While the findings of fact do not show that Manion knew he was fleeing police officers, the findings of fact highlight that he was fleeing someone. This finding is another piece of circumstantial evidence that supports the conclusion that Manion actually possessed the .22 caliber firearm.

¶69 Manion argues that the findings of fact and the record as a whole both show that he was "entirely cooperative when the police made their presence known," which shows that he did not possess the .22 caliber firearm. While the findings of fact state that Manion complied with the officers' orders, this does not negate his initial fleeing.

¶70 In sum, there was a high probability that Manion was a contributor to DNA on the .22 caliber firearm, Manion was found close to the .22 caliber firearm, and Manion initially fled an unmarked police vehicle. Viewing this evidence in the light most favorable to the State, a rational factfinder could reasonably infer that Manion actually possessed the .22 caliber firearm.

¶71 The State also points to two other pieces of circumstantial evidence: (1) Manion's stooping down toward the bushes and (2) the dry condition of the firearm. But the trial court did not make any written or oral findings regarding this circumstantial evidence. Thus, the State may not rely on that evidence to support the conclusion of law that Manion actually possessed the .22 caliber firearm.[118]

¶72 Manion argues that the State could not prove that he actually possessed the firearm because no one saw him with a firearm, he did not threaten to use the firearm,

---

[117] Report of Proceedings (Apr. 26, 2011) at 239.

[118] *See Armenta*, 134 Wn.2d at 14.

he never acted like he had a firearm, and the firearm was unloaded and had no ammunition. Thus, Manion argues that the State had to rely on the theory of constructive possession. But Manion fails to acknowledge that actual possession can be proved by circumstantial evidence. Manion lists circumstances that are not present in this case. But this absence of circumstances does not mean that the circumstantial evidence admitted in this case was insufficient to prove actual possession.

¶73 Manion cites several cases that primarily focus on constructive possession.[119] Thus, most of these cases are not relevant to the trial court's conclusion that Manion actually possessed the .22 caliber firearm. As the State points out, only one case, *State v. Spruell*, addresses actual possession.[120] But *Spruell* is distinguishable.

¶74 In *Spruell*, police officers executed a search warrant in Spruell's home.[121] The police officers saw Luther Hill move away from a table where police found cocaine.[122] Hill's fingerprint was on a plate that contained the drugs.[123] This court concluded that there was insufficient evidence to prove Hill had actual possession of the drugs because the fingerprint proved only that Hill had touched the plate, and there was no evidence that Hill was fleeing the police officers.[124]

---

[119] *See, e.g., State v. Enlow*, 143 Wn. App. 463, 468-69, 178 P.3d 366 (2008) (concluding that there was insufficient evidence to prove constructive possession of a truck containing methamphetamine and items to manufacture this drug partly because the defendant did not own the truck or rent the residence where the truck was parked); *State v. Cote*, 123 Wn. App. 546, 549-50, 96 P.3d 410 (2004) (explaining that the State did not claim that the defendant had actual possession of drugs and there was insufficient evidence to prove constructive possession); *Staley*, 123 Wn.2d at 802 (concluding that jury instructions did not accurately represent the law regarding possession).

[120] 57 Wn. App. 383, 788 P.2d 21 (1990).

[121] *Id.* at 384.

[122] *Id.*

[123] *Id.*

[124] *Id.* at 386-87.

¶75 Here, in contrast, there was a high probability that Manion was a contributor to the DNA on the .22 caliber firearm, which was the contraband itself. Further, the trial court entered additional findings of fact, including Manion's flight and his proximity to the .22 caliber firearm. Given these findings of fact, a rational trier of fact could conclude that Manion actually possessed the .22 caliber firearm.

¶76 We affirm the order of disposition.

GROSSE and LAU, JJ., concur.