# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

              Respondent,

        v.

OSCAR ARMANDO QUINTANILLA,

              Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 69122-8-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 21, 2014

APPELWICK, J. — Quintanilla appeals his conviction for second degree assault by strangulation. He argues that the conviction is not supported by sufficient evidence and that a sentence condition prohibiting contact with his daughter for 10 years was imposed without considering its reasonable necessity. We affirm Quintanilla's conviction but remand for further proceedings regarding the no-contact provision.

## FACTS

Based on allegations that Quintanilla strangled and threatened A.J.Q., killed the family cat, and shoved A.J.Q.'s mother, Tara Sanchez, the State charged him with assault by strangulation, harassment, first degree animal cruelty, and fourth degree assault. The State also charged Quintanilla with a number of sex offenses against A.J.Q., including child molestation, attempted rape of a child, rape of a child, and second degree rape.

At trial, the State's evidence established that during the summer of 2011, Quintanilla lived in Kent with Sanchez, their teenage daughter, A.J.Q., and Sanchez's

children from a prior marriage. Because Quintanilla was concerned about the attention A.J.Q. received from boys, she was not allowed to wear two piece bathing suits.

In early July 2011, A.J.Q. attended a neighbor's pool party with her siblings and Sanchez. When they returned home, Quintanilla noticed that A.J.Q. was wearing a two piece bathing suit underneath her shorts and shirt. When he asked about the suit, A.J.Q. said that she wore her clothes over it the entire day. Sanchez, however, said that A.J.Q. took her outer clothes off when she went in the pool. Upset that A.J.Q. lied to him, Quintanilla told her to go to the master bedroom.

According to A.J.Q., Quintanilla came into the bedroom, grabbed her shirt, and proceeded to choke her. She testified, "he was still yelling at me about what I had worn . . . . And then he pushed me into the wall, by the TV, and then he . . . put his hands around my neck." He proceeded to push her head against the wall, and "was squeezing [her] neck" with "quite a lot of pressure." When asked if she had "a hard time breathing," A.J.Q. said, "Kind of. I had put both my hands . . . on his wrist, and I had tried to . . . push it away, and when I did that, his grip got tighter." She testified that it became more difficult to breathe at that point and that the choking lasted about five minutes.

A.J.Q. testified that when she returned to the living room, she saw her reflection in a mirror and noticed red marks on her neck where Quintanilla's hand had been. A.J.Q.'s friend testified that A.J.Q.'s upper chest and neck were "kind of red" when she came out of the bedroom.

Quintanilla testified and admitted grabbing A.J.Q.'s shirt and getting "in her face." He denied choking her.

Sanchez testified that on July 24, 2011 Quintanilla threw her into some laundry baskets, causing her to hit her head on the doors in front of a washer and dryer. Quintanilla denied throwing Sanchez and claimed they both fell down when she tried to hit him in the chest.

A few days later, the family cat defecated in the living room. According to A.J.Q., Quintanilla threw the cat "really hard" against the wall. He then threw it into the living room and kicked it against the couch. He eventually took it into the bathroom. A.J.Q. could hear him beating the cat in the bath tub with a toy gun. She went into the bathroom and saw Quintanilla repeatedly punch the cat in the head. She asked him to stop, but Quintanilla told her "to shut the fuck up or [she] was next." A.J.Q. was afraid that Quintanilla would physically harm her.

When Quintanilla finished with the cat, he screamed at A.J.Q. to "[m]op that shit up." Later that morning, A.J.Q. held the cat as it died. Sanchez called 911 to report that Quintanilla killed the cat. When police arrived, they photographed the injuries to the cat's body along with bruising on Sanchez's elbow and leg from the incident on July 24. They arrested Quintanilla when he returned home from work.

The jury acquitted Quintanilla of the molestation and rape charges but convicted him of second degree assault for strangling A.J.Q. They also convicted him of harassment for threatening A.J.Q., fourth degree assault for the incident with Sanchez,

3

and first degree animal cruelty. Quintanilla's sentence included a provision prohibiting contact with A.J.Q. for 10 years. He appeals.

## DECISION

Quintanilla first contends the evidence was insufficient to support a finding that he strangled A.J.Q. Evidence is sufficient if, after viewing it in the light most favorable to the State, any rational trier of fact could find guilt beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Id. We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Manion, 173 Wn. App. 610, 633, 295 P.3d 270 (2013).

To convict Quintanilla of second degree assault as charged in this case, the jury had to find that he assaulted A.J.Q. by "strangulation." The court instructed the jury that "[s]trangulation means to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." Therefore, the State was required to prove beyond a reasonable doubt that Quintanilla actually compressed A.J.Q.'s neck and _either_ obstructed or intended to obstruct her blood flow or ability to breathe.[1] See State v. Reed, 168 Wn. App. 553, 574-75, 278 P.3d 203, review denied, 176 Wn.2d 1009, 290 P.3d 995 (2012).

---

[1] Contrary to Quintanilla's assertion, it was unnecessary for the State to prove that he intended to obstruct A.J.Q.'s blood flow or breathing. Reed, 168 Wn. App. at 576.

A.J.Q. testified that Quintanilla placed one hand around her neck, pushed her against a wall, and squeezed her neck for five minutes. During that time, she had difficulty breathing. A rational trier of fact could find from this evidence that Quintanilla compressed A.J.Q.'s neck and obstructed her breathing.[2]

Quintanilla also challenges the sentence condition prohibiting him from having any contact with A.J.Q. for 10 years. He contends the court failed to address whether the condition was reasonably necessary. Because the condition impacts his constitutional right to parent, and because nothing in the record indicates that the court considered whether the condition and its parameters were reasonably necessary, we remand for further proceedings.

We review crime related prohibitions, including no-contact orders, for abuse of discretion. State v. Ancira, 107 Wn. App. 650, 653, 27 P.3d 1246 (2001); In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374-75, 229 P.3d 686 (2010). However, prohibitions that impact fundamental rights, such as the right to parent, are more closely scrutinized to ensure that they are sensitively imposed and reasonably necessary to accomplish the needs of the State. Rainey, 168 Wn.2d at 377-80. Although no court has required written findings supporting provisions that affect fundamental rights, courts must consider on the record whether such provisions and their "parameters"—i.e. scope and duration—are reasonably necessary. See Rainey, 168 Wn.2d at 382 (remanding "so that the sentencing court may address the parameters of the no-contact order under

---

[2] "Obstruct" means both "[t]o clog or block (a passage) with obstacles" or "[t]o impede, retard, or interfere with." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 812 (1984). Thus, the State had to prove only that Quintanilla impeded A.J.Q.'s breathing.

the 'reasonably necessary' standard."). Because the record in this case does not reflect such consideration by the sentencing court, we remand for the court to undertake such consideration on the record and to either reaffirm or amend the no-contact provision as necessary.[3]

Affirmed in part and remanded in part.

_Appelwick, J._

WE CONCUR:

_Spearman, C.J._          _Schindler, J._

---

[3] We note that the record amply demonstrates the reasonable necessity of a no-contact provision. Quintanilla strangled his daughter, assaulted his adult girlfriend, and viciously beat the family cat to death in front of them. While beating the cat, he told A.J.Q. to "shut the fuck up or [she] was next." He then made her clean up the mess from the killing. A no-contact provision of some scope and duration was plainly necessary. With respect to the provision's scope, prohibiting *all* contact with A.J.Q was arguably necessary since any physical contact would put A.J.Q. at risk of physical harm, and any form of contact could put her at risk for further emotional harm. Finally, the duration of the order could arguably be justified as well. Quintanilla's assault of Sanchez, who was in her thirties, demonstrates that he will pose a physical and emotional risk to A.J.Q. even when she becomes an adult. A 10 year no-contact order arguably ensures that A.J.Q. is more mature and physically stronger when she next has contact with Quintanilla. See State v. Aguilar, 176 Wn. App. 264, 278, 229 P.3d 686 (2010) ("Furthermore, the 10-year length of the no contact order allows Mr. Cortes to regain contact with his children when the children are at a more mature age and can address their relationship with their father in light of the events that occurred.").