IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

JENNA J. WHEELER, on behalf of
herself and her minor daughter,
CHASTITY YOUNGBLOOD, and
as the Personal Representative of
the Estates of NIKOLAS W.
WEISENBACH and OMEN W.
WEISENBACH,

                    Appellants,

           v.

MARVIN G. BOCK and NADINE
EVANS, husband and wife, and
the marital community composed
thereof; MACPHERSON'S
PROPERTY MANAGEMENT,
INC., a Washington corporation,

                    Respondents,

SUBARNA KAKSHAPATI, a single
person; PEAK IMPROVEMENTS,
LLC, a Washington limited liability
corporation,

                    Defendants.

No. 79427-2-I

DIVISION ONE

UNPUBLISHED OPINION

SMITH, J. — This case concerns the tragic death of a young man and his son. Nikolas Weisenbach and his son, Omen, died from smoke inhalation caused by a fire in the apartment where they lived with Jenna Wheeler and her daughter, Chastity Youngblood.[1] After their deaths, Jenna, on behalf of herself,

_____

[1] We refer to individuals by their first names where it provides a distinction between family members.

Citations and pin cites are based on the Westlaw online version of the cited material.

her daughter, and the decedents' estates (collectively Wheelers), sued MacPherson's Property Management (MPM) and Marvin Bock and Nadine Evans (collectively respondents) for wrongful death. The Wheelers alleged that the respondents acted negligently by violating the municipal code, which required property owners to have a self-closing and self-latching door between private garages and dwelling units.

After the Wheelers' fire dynamics expert, Kenneth Rice, contradicted his deposition testimony and opined that Nikolas and Omen were alive before neighbors forced open the apartment's exterior garage door, MPM moved to strike Rice's declaration. The trial court granted MPM's motion but only with regard to Rice's statements that Nikolas and Omen were alive prior to the garage door being opened. Because the statements were in clear contradiction to his prior testimony, we affirm the trial court's order striking Rice's statements. We further conclude that the admissible evidence failed to present any genuine issues of material fact as to whether the broken self-closing mechanism was the cause in fact of Nikolas's and Omen's deaths. Therefore, we affirm the trial court's orders granting summary judgment in favor of the respondents.

FACTS

Beginning in 2015, Nikolas and Jenna, along with their children Chastity, age nine, and Omen, age four, leased unit A at 2307 O St. NE in Auburn, Washington. Unit A was a part of "a two story, multi-family" structure with four single family units and "four single car garage spaces on the south side of the structure" (property). Throughout their lease, Jenna and Nikolas used their

attached garage as a "living space" and did not park an automobile therein.

In 2017, Bock and Evans sought to purchase the property, which MPM managed. Prior to their purchase, Bock and Evans received two inspection reports, one report from the previous owner's inspection, and a second report, which they had completed. Both inspection reports found that unit A's self-closing door between the garage and the kitchen was broken. The first inspection report noted that the self-closing door was "intended to prevent vehicle fumes from entering living spaces and to slow the spread of fire from the garage to living spaces." The second inspection report recommended that the property owners repair the self-closing door. Bock later testified that he was aware of the issue but did not "want to jeopardize the sale of the property by asking for too much," so he did not request that the previous owner repair the door.

On July 9, 2017, Bock and Evans finalized their purchase of the property. That same day, Jenna and Nikolas were in their garage, drinking, smoking marijuana, and listening to music with their friend and neighbor, Ashley Sodorff. Ashley and her father, Robert Sodorff lived at the property in the unit adjacent to Nikolas and Jenna. Shortly after Ashley returned to her home, at around 11:30 p.m., a fire started in unit A's kitchen. A pot of vegetable oil was left unattended and caught fire after overheating. In his report, Valley Regional Fire Authority (VRFA) Deputy Fire Marshall John Monsebroten found that "[t]he activation of the stove element appears accidental based on interviews and the area of origin exam."

When the fire started, Chastity and Omen were sleeping in their bedroom on the second floor. When she smelled smoke, Chastity told Omen to stay there and went downstairs. She "saw fog everywhere" and "described the smoke level to be at about 4 feet, just low enough to have to stoop but not so low as to crawl." However, Chastity did not see any flames until she reached the kitchen. When Chastity entered the kitchen, Jenna entered from the garage, and they exited through the slider door on the side of the house. They left the slider door open. Nikolas, who was originally outside as well, entered the home through the slider door and went upstairs to get Omen.

The Sodorffs heard a commotion and exited their unit through their garage. At some point, Matthew Ditmar, another individual living at the property, and Robert forced open the exterior garage door to unit A. At the time, "[t]here was no fire in the garage," but the kitchen was a "[a] wall of fire," from "[f]loor to ceiling." "[W]ithin two to three seconds," the fire spread towards the exterior garage door, "rolling up along the ceiling" of the garage space. Various witnesses stated that at one point, they "thought they heard" an explosion and that, thereafter, the fire grew significantly in size and intensity.

At some point, Nikolas opened the children's bedroom window. Deputy Fire Marshall Monsebroten testified that based on a video exhibit, while he did not have a "defined timeframe" for when Nikolas opened the window, "it changed the [fire's] vent path," accelerating the fire. He testified that with "'the fire behavior that occurred on floor 2," it is unlikely that anyone "would have survived [even] in PPE.'" His report also stated that "[t]he garage door being opened

4

effected ventilation of the fire" and "increased fire growth in the garage and kitchen." The fire then intensified and spread "to adjacent areas."

In her declaration, Megan Chaney, another witness, recalled that when she and Trevor Smith heard screaming and saw the fire, they ran to the Wheelers' home to assist them. At the time, she remembered seeing "Nickolas [sic] moving around in the children's upstairs bedroom through the window in that bedroom." She stated that there was no fire in the bedroom at that time, but that shortly after she and Smith arrived, "[w]hat had been a relatively small fire confined primarily to the kitchen area had suddenly and unexpectedly turned into a massive fire enveloping the entire unit."

In his declaration, Smith stated that he could not remember "whether the garage door was opened or closed" when he approached the house. When he reached the slider door, Smith alleged that "the fire suddenly erupted" and engulfed the second floor. After the fire enveloped the rest of the apartment, Chaney "could again see Nik in the children's upstairs bedroom," standing at the open window. Instead of jumping, as onlookers suggested, "Nik turned and went back into the bedroom." Chaney testified that, thereafter, she heard him scream.

The respondents' expert fire investigator, Richard Carman, testified that the fire "expanded out very quickly," creating a "tremendous amount of" smoke, or what he referred to as "unburned fire gases." According to Carman, unburned fire gases are "molecules of toxic chemicals" that are "extremely dangerous and deadly." He alleged that the fire gases "immediately . . . extended to the stairway[ and] . . . filled up the second floor," and that Omen "was obviously

5

affected very quickly." Carman testified that based on Omen's autopsy, Omen had a 52 percent saturation of the harmful chemical, carbon hemoglobin, and that such a percentage "is certainly more than enough to kill someone." Carman stated that an individual begins to lose consciousness at 40 percent saturation of carbon hemoglobin. Carman further asserted that Nikolas "probably died within one to two minutes after he reached the second floor because his saturation level was 72 percent," but that Nikolas became disoriented immediately upon entering the second floor to look for Omen.

After the fire was extinguished, Nikolas and Omen were found deceased in the children's second story bedroom: Nikolas "at the foot of the children's bunk-bed," and Omen "face down in the doorway." Autopsies indicated that both Nikolas and Omen died from "toxic asphyxia due to smoke inhalation." Nikolas had prominent thermal charring of his body, and Omen had "near total charring of the body surface."

PROCEDURE

In September 2017, the Wheelers sued the respondents for the wrongful death of Nikolas and Omen.[2] The Wheelers alleged that the respondents were negligent in failing to repair the self-closing door between the garage space and the kitchen and that when the neighbors forced open the exterior garage door, air from the outside accelerated the fire, causing Nikolas's and Omen's deaths. Specifically, the Wheelers argued that had the interior garage door automatically

---

[2] Other listed defendants, including the previous property owner, are not parties to this appeal.

6

closed as required by the city of Auburn's (City) municipal code, oxygen would not have been able to enter the home and accelerate the fire.

During discovery, the respondents deposed the Wheelers' "fire science" expert, Rice. During the deposition, the respondents asked Rice, "Can you testify whether Nik and Omen were still alive or not when the exterior garage door was opened?" He responded, "No." Rice also said that he did not have an opinion on how long someone could survive in smoke or heat without protective gear.

In October 2018, MPM and Bock and Evans separately moved for summary judgment dismissal of all of the Wheelers' claims. MPM asserted that the Wheelers failed to present a genuine issue of material fact with regard to causation. MPM also argued that Jenna's expert, Rice, did not and could not testify that Nikolas and Omen were alive when the neighbors forced open the garage door.

In their opposition, the Wheelers submitted Rice's declaration, where he opined that Nikolas and Omen were alive when the neighbors forced the exterior garage door open. He explained the contradiction to his deposition: "When I stated in my deposition that I could not 'testify whether Nik and Omen were still alive or not when the exterior garage door was opened', I meant that I could not testify to such a fact from my own personal knowledge or observation."

In their reply to the Wheelers' opposition, MPM moved to strike Rice's declaration, in particular, his statements that Nikolas and Omen were alive before the neighbors opened the exterior garage door. MPM argued that these opinions

were contrary to Rice's own deposition testimony, were speculative, and were "beyond the scope of his expertise." The court granted the motion to strike with regard to Rice's statements that Nikolas and Omen were alive when the garage door was opened. It concluded that the statements were "conclusory, unsupported and directly contradictory to very clear, significant questions that were asked of him at [his] deposition."

Thereafter, the court granted the respondents' summary judgment motions but "not without tremendous consideration and care." Specifically, the court concluded that the Wheelers failed to present evidence from which reasonable inferences could be drawn without speculation and that "[t]here simply [was] an absence of . . . [the] causation element." The Wheelers moved for reconsideration, which the trial court denied.[3] The Wheelers appeal both orders granting summary judgment.

ANALYSIS

Rice's Opinion Testimony

The Wheelers contend that the trial court erred when it struck Rice's

---

[3] In their assignment of errors, the Wheelers contend that the trial court erred when it denied their motion for reconsideration. However, the Wheelers did not discuss the standards applicable for the court's review of a motion for reconsideration, namely, CR 59, they provided no legal argument on that basis, and even following MPM's assertion that they failed to adequately present the issue for our review, they did not discuss the motion for reconsideration. Because "[w]e will not consider arguments that a party fails to brief," Sprague v. Spokane Valley Fire Dep't, 189 Wn.2d 858, 876, 409 P.3d 160 (2018), we do not address this claim and do not consider evidence that the Wheelers attached to their motion for reconsideration. See Sprague, 189 Wn.2d at 876 (refusing to address petitioner's claims, where he did not brief the claims and cited no law establishing them).

opinion testimony that Nikolas and Omen were alive before the garage door was forced open. Because the statements contradicted his deposition testimony, we disagree.

Although we usually review a trial court's ruling on a motion to strike for abuse of discretion, when a motion to strike a statement from an affidavit or declaration "is made in conjunction with a motion for summary judgment, we review de novo." Southwick v. Seattle Police Officer John Doe No. 1, 145 Wn. App. 292, 297, 186 P.3d 1089 (2008). "[A]ffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." CR 56(e). "[A]n affidavit cannot be used to create an issue of material fact by contradicting prior deposition testimony." Davis v. Fred's Appliance, Inc., 171 Wn. App. 348, 357, 287 P.3d 51 (2012). Specifically, "'[w]hen a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" McCormick v. Lake Wash. Sch. Dist., 99 Wn. App. 107, 111, 992 P.2d 511 (1999) (second alteration in original) (internal quotation marks omitted) (quoting Klontz v. Puget Sound Power & Light Co., 90 Wn. App. 186, 192, 951 P.2d 280 (1998)). Such testimony will be considered inadmissible, and a court cannot consider it "when ruling on a motion for summary judgment." Dunlap v. Wayne, 105 Wn.2d 529, 535, 716 P.2d 842 (1986).

McCormick is instructive. There, Laurie McCormick appealed a summary judgment order dismissing her claims based on her alleged employment with Lake Washington School District. McCormick, 99 Wn. App. at 109. McCormick asserted that although she received neither board approval nor a written contract as required for employment, a District representative, Becky Anderson, had apparent authority to hire her and made a verbal offer of employment, inducing employment by estoppel. McCormick, 99 Wn. App. at 109. To this end, in her deposition, McCormick stated that she did not know whether Anderson had the authority to offer her a position. McCormick, 99 Wn. App. at 111-12. However, in a later declaration, she "unequivocally" stated that Anderson had such authority. McCormick, 99 Wn. App. at 112. The court concluded that McCormick's declaration was inadmissible because it was "in 'flat contradiction' to her deposition and therefore [could] not be used to determine whether issues of material fact exist[ed]." McCormick, 99 Wn. App. at 112.

Here, like McCormick's statements, Rice's subsequent opinion in his affidavit contradicted his deposition testimony. In his deposition, Rice testified that he did not know—or could not testify as to—whether or not Nikolas or Omen were alive when the neighbors forced open the exterior garage door. But in his affidavit, relying on the declarations of Chaney and Smith, and the VRFA report, he stated unequivocally that "Nikolas was alive before the garage door opened, and died shortly after it was opened" and that the "evidence establishes that Omen was alive before the garage door opened." Thus, like in McCormick, Rice's declaration statements were in flat contradiction to his deposition and

were inadmissible to determine whether an issue of material fact existed.

In an attempt to explain the contradictory nature of his testimony, Rice alleged that his opinion had changed because, in his deposition, he only had meant that he "could not 'testify'" to whether Nikolas or Omen were alive "from [his] own personal knowledge or observation" and that he gave his deposition before reading the declarations of Chaney or Smith. His explanation is unpersuasive and disingenuous for at least two reasons. First, while a statement that explains a previous statement may be admissible, a statement that contradicts a previous statement is not. See McCormick, 99 Wn. App. at 112. And like in McCormick, Rice's statement does not "merely explain" his deposition testimony. 99 Wn. App. at 112. Second, Rice's contention that his deposition testimony was only with regard to his personal knowledge, does not ring true. He was an expert witness, not a fact witness. And "expert witnesses are not required to have personal, firsthand knowledge of the evidence on which they rely." State v. Lui, 153 Wn. App. 304, 321, 221 P.3d 948 (2009), aff'd, 179 Wn.2d 457, 315 P.3d 493 (2014). Therefore, the trial court did not err when it struck Rice's statements pertaining to the timing of Nikolas's and Omen's deaths.

The Wheelers disagree and attempt to distinguish testimony from an opinion, stating that "Rice was never asked whether he had an opinion as to whether Nikolas and Omen were alive when the exterior garage door was open." Contrary to the Wheelers' assertion, opinion and testimony are distinguishable

11

only in that testimony can be, but is not always, an opinion. [4] Thus, when asked if he could testify as to whether Nikolas and Omen were alive, Rice was asked if he could opine as to the issue. Accordingly, there is no relevant distinction between opinion and testimony, and we are not persuaded by the Wheelers' attempt to manufacture one.

## Summary Judgment

The Wheelers contend that the trial court erred when it granted the respondents' motions for summary judgment. Because there were no genuine issues of material fact with regard to cause in fact, we disagree.[5]

"We review summary judgment orders de novo, considering the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). "Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." Green v. Normandy Park, 137 Wn. App. 665, 681, 151 P.3d 1038 (2007). "Summary judgment is proper on a factual issue only if reasonable minds could reach but one conclusion on it." Bohn v. Cody, 119 Wn.2d 357, 363,

---

[4] Under "opinion testimony," *Black's Law Dictionary* states, "See TESTIMONY." BLACK'S LAW DICTIONARY 1318 (11th ed. 2019).

[5] Because we conclude that the Wheelers failed to present evidence of cause in fact, we do not reach the issues of duty and breach based on the City's building code. See, e.g., Lynn v. Labor Ready, Inc., 136 Wn. App. 295, 309-313, 151 P.3d 201 (2006) (dismissing plaintiff's negligence claim and refraining from deciding the issue of duty and breach where the plaintiff failed to present evidence of proximate cause).

832 P.2d 71 (1992).

To prevail on their negligence claim, the Wheelers were required "to establish (1) the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury." Behla v. R.J. Jung, LLC, 11 Wn. App. 2d 329, 334, 453 P.3d 729 (2019), review denied, 460 P.3d 180 (2020). "Proximate cause consists of two elements: cause in fact and legal causation." Sluman v. State, 3 Wn. App. 2d 656, 701, 418 P.3d 125, review denied, 192 Wn.2d 1005 (2018).

To prevail on the issue of cause in fact, the Wheelers were required to "supply proof for a reasonable person to, 'without speculation,' infer that" the non-closing interior garage door "*more probably than not* caused" Nikolas's and Omen's deaths. Behla, 11 Wn. App. 2d at 335 (emphasis added) (quoting Little v. Countrywood Homes, Inc., 132 Wn. App. 777, 781, 133 P.3d 944 (2006)). "As a determination of what actually occurred, cause in fact is generally left to the jury." Hartley v. State, 103 Wn.2d 768, 778, 698 P.2d 77 (1985). But "[c]ause-in-fact may be determined as a matter of law if the causal connection is so speculative and indirect that reasonable minds could not differ." Doherty v. Mun. of Metro. Seattle, 83 Wn. App. 464, 469, 921 P.2d 1098 (1996).

Here, we clearly have a tragic injury: the deaths of Nikolas and Omen, and it is undisputed that Nikolas and Omen died from asphyxia due to smoke inhalation.[6] However, the evidence is not sufficient for a reasonable juror to

---

[6] For some of their propositions, the Wheelers rely on declarations attached to their motion for reconsideration. As discussed above, those declarations were not before the court on the respondents' motions for summary

conclude or infer that the respondents' alleged breach—i.e., their failure to repair the self-closing door—more probably than not caused Nikolas's and Omen's deaths. Specifically, there was not sufficient evidence that (1) Omen was alive before the exterior garage door was open and (2) had the self-closing door functioned properly, either Nikolas or Omen would have been able to safely exit the property and more likely than not would have survived.

No one testified that they saw Omen alive before the garage door was open. Thus, there is no evidence—direct or circumstantial—which supplied proof that had the interior garage door properly functioned, Omen more likely than not would be alive. To allow the jury to conclude that he was alive when the garage door was opened would invite unreasonable speculation. Accordingly, there was no genuine issue of material fact as to the proximate cause of Omen's death, and the trial court did not err in granting summary judgment in favor of respondents on that issue.

Similarly, there was no direct evidence to support the conclusion that Nikolas was alive when the neighbors opened the exterior garage door. No witness could have observed the bedroom window and the garage door at the same time because the bedroom window, located above the sliding glass door, was on a different side of the unit and out of the line of sight from the bedroom window. However, taking the circumstantial evidence in the light most favorable to the Wheelers, a reasonable juror could conclude that Nikolas was still alive

---

judgment, and accordingly, we do not rely on them in completing our review. See Green, 137 Wn. App. at 678 (The appellate court reviews a motion for summary judgment "based solely on the record before the trial court.").

when the neighbors forced open the exterior garage door

Nonetheless, the Wheelers provided no evidence below and point to none on appeal that supports an inference that either Nikolas or Omen would have been able to exit the home safely had the self-closing door functioned properly and oxygen not entered the home when the exterior garage door was forced open. Before the garage door was opened, Nikolas was upstairs, and the fire had grown into a "wall of fire" in the kitchen. There is no evidence that Nikolas would have been capable of surviving the toxic smoke in the home or avoiding the fire in the kitchen before it expanded to the second floor. Because we do not deny summary judgment based on "an unreasonable inference," Marshall v. AC & S Inc., 56 Wn. App. 181, 184, 782 P.2d 1107 (1989), we conclude that summary judgment was proper based on the proximate cause element.

The Wheelers disagree and assert that if fire or "thermal injury" contributed to their death, it is dispositive proof that both Omen and Nikolas were alive prior to the garage door being opened. This contention fails for a number of reasons. First, while there is evidence in this case that Nikolas and Omen were burned, there is no evidence that burns caused their deaths. Second, the Wheelers do not provide evidence that the thermal injury could have occurred *only after* the neighbors opened the exterior garage door. Indeed, Nikolas and Omen could have been burned prior to the garage door being opened. Thus, we are not persuaded.

The Wheelers also contend that "[s]ince John Monsebroten could not assume that the fire had reached the second floor before the garage door was

opened, . . . it is reasonable to infer that Omen [or Nikolas] died after the garage door was opened when the fire reached the second floor." But Deputy Fire Marshall Monsebroten's inability to draw a conclusion as to whether the fire had reached the second floor does not allow for a reasonable inference that Omen and Nikolas were still alive when it did. This is particularly true because Nikolas's and Omen's autopsies concluded that they died from smoke inhalation.

Finally, the Wheelers rely on Martini v. Post, 178 Wn. App. 153, 313 P.3d 473 (2013), for various propositions. There, Thomas Martini and his wife, Judith Abson, leased a house from Paul Post. Martini, 178 Wn. App. at 157. The second story bedroom windows were broken and would not open, and Post failed to repair them. Martini, 178 Wn. App. at 156-57, 159. Abson died from smoke inhalation after she was trapped in the second floor bedroom by a fire that began in the home's basement. Martini, 178 Wn. App. at 157-58. Martini sued Post under multiple theories of liability. Martini, 178 Wn. App. at 170-71. After the trial court granted summary judgment in favor of Post on the issue of proximate cause, Martini moved for reconsideration and introduced new evidence of handprints around the bedroom window and a declaration from a medical expert that Abson would have survived had the bedroom window functioned properly. Martini, 178 Wn. App. at 159.

On appeal, the court held that the newly introduced evidence presented a genuine issue of material fact with regard to whether the broken windows were the proximate cause of Abson's death. Martini, 178 Wn. App. at 159, 166. It therefore concluded that the trial court erred in granting summary judgment.

Martini, 178 Wn. App. at 171-72.  Here, unlike in Martini, there is no evidence from which a reasonable juror could infer that Nikolas and Omen more likely than not would have survived had the door been repaired.  Thus, Martini is not persuasive.

For the foregoing reasons, we affirm.

_____

WE CONCUR:

_____        _____
Leach, J.                               Appelwick, J.